## Jonas H. Titus v. The Minnesota Mining Company.

Complainant, as president and agent of the Baltimore Mining Company, made a written agreement to sell to H. and his associates the location of the Baltimore Co.; they to pay therefor $4,500, and to deliver to him "proper certificates of one-fifth the entire interest in said location, and in the capital stock of a company to be formed for mining thereon to be forever unassessable, and to be delivered to the shareholders" of the Baltimore Company. To this was attached an undertaking on the part of H. and his associates to take stock in the proposed new company, according to the tenor of this agreement. The $4,500 was paid, and complainant transferred the location to H. who gave back an undertaking, that on the formation of the proposed new company, on such location, one-fifth of its stock should be issued to the president of the Baltimore Company, "*to be endorsed by him and delivered to the shareholders*" of that company. A new company, the Vulcan, was formed as contemplated by this arrangement, to which H. conveyed the Baltimore location; and the association, in their articles, state their object to be the prosecution of mining operations, on the location obtained from the Baltimore Company, "*or on any other lands that may be leased, located or bought by the association for mining purposes.*" The stock for the shareholders of the Baltimore Company was not delivered. Complainant afterwards, in his own name, but claiming to be trustee of such shareholders, filed a bill in Chancery, alleging that the Vulcan Company had purchased another location in the name of H., and in order to defraud him and the shareholders of the Baltimore Company of their rights under the agreement, the shareholders of the Vulcan had formed a new Company—the Minnesota, since incorporated—to which H. had conveyed such new location; that the Vulcan Company was now to all practical purposes dissolved and dead, and the Minnesota fraudulently and collusively substituted in its place, and the latter is now in fact and in truth the Vulcan—and praying that it might be decreed to deliver to complainant, as president of the Baltimore Company, for the use thereof, one-fifth of its stock; and for an account.

*It seems* that the contract on the part of H. and his associates, was not with complainant as *trustee* of the Baltimore Company, but with the *company* acting through him as its agent; and that the company was a necessary party complainant to the bill.

*It seems*, also, that the supplementary agreement given by H. to complainant is of no binding force, there being no proof that the associates of H. authorised any modification of the first agreement, and the authority of the Baltimore Company to complainant, to make sale of their location, not conferring upon him power to make partition or distribution of the proceeds of the sale.

The Vulcan Company being still in existence, and the owner of the location purchased of the Baltimore, it is not and can not be identical with the Minnesota, and it should be defendant in the suit.

The insertion in the articles of the Vulcan Company of a clause looking to the prosecution of mining operations on other lands than those purchased of the Baltimore, could not enlarge the rights of the Baltimore Company under the agreement, nor place the Vulcan under obligation to purchase other lands for such operations. It was without consideration from the Baltimore, and that company was not a party to it. The Vulcan Company might strike out that clause without giving the Baltimore any right to complain.

TITUS v. THE MINNESOTA MINING CO.

There was no fraud upon the Baltimore Company, or upon complainant, in the members of the Vulcan Company purchasing a new location, and forming a new company to work it, to the exclusion of complainant.

Nor does proof showing that H. bought the location now occupied by the Minnesota, stating at the time that he bought it for the Vulcan Company, and that the agent of that Company, without its authority, worked for a time upon it, representing it to have been bought by that company, and that the Vulcan Company declined to take it, and its members formed a new company with the express design of excluding the Baltimore Company from the benefits its shareholders would have derived from its being purchased by the Vulcan, make out any case of fraud upon the Baltimore Company, since it does not deprive it or its shareholders of any right intended to be given, or which it or they had a right to demand, under the original agreement.

*Heard November 15th, 16th, 17th and 18th, 1859. Decided May 22d.*

Appeal by complainant from the Wayne Circuit in chancery.

The testimony in the case was voluminous, filling a large volume, and except where it consisted of written documents, to a considerable extent contradictory. No attempt will be made to give here even an abstract of it, or a statement of its general result; and reference must be had to the opinions for the impressions left by it on the minds of the several judges. The following, however, which is in some measure copied from the clear and succinct statement of facts embraced in the opinion of Hon. SANFORD M. GREEN, the Circuit Judge who decided the case in the court below, is believed to embrace such leading facts as are necessary to be stated in order to an understanding of the legal questions.

Some time in the year 1845, the Baltimore Mining Company, consisting of the complainant and ten others, was organized for the purpose of mining copper and other ores in the Upper Peninsula of Michigan, as a joint stock company. Its capital stock was divided into 3,000 shares. Upon the first organization of the company, the complainant was elected its president, which office he has ever since continued to hold.

In 1846, that company held leases issued by the War Department of the United States, numbered 267 and 269, covering each one square mile, in the mineral district of the Upper Peninsula.

On or about the 21st day of November, 1846, the complainant, as president and agent of the said company, duly authorized for that purpose, sold and transferred the said two leases to William Hickok, or to William Hickok & Co., of the city of New York, as the basis upon which a new company was to be formed for mining purposes.

The agreement for such sale on the part of the complainant was in the following words:

"Memorandum of an agreement by and between Jonas H. Titus, of the city of Detroit, as president of the Baltimore Mining Company, and Hickok & Co., of the city of New York, viz:

"First: Jonas H. Titus, as president and duly authorized agent of the Baltimore Mining Company, agrees to sell to Hickok & Co. and their associates, the two western locations of said Baltimore Company, held by leases 267 and 269 from the War Department, and fully described therein.

"Second: Hickok & Co. and their associates agree to pay the sum of four thousand five hundred dollars on the proper assignment and transfer to them and their associates, or to the trustees of a company formed by them, of the leases 267 and 269 above referred to.

"Third: Also to deliver to said Jonas H. Titus proper certificates of one-fifth of the entire interest in and to said locations, and the capital stock of a company formed for mining thereon, to be forever unassessable, and to be delivered to the shareholders of the Baltimore Mining Company.

"Fourth: A company for mining purposes shall be formed in the city of New York on the basis of these locations, of which the capital stock shall be divided into shares as hereafter named, each subscriber paying an assessment of one and fifty-one hundredths dollars per share, at the time of each subscription, for the aforesaid sum of purchase.

"Fifth: When all the stock shall have been taken up, there shall be a meeting of the subscribers, at which each

8 MICH.—N

share shall be entitled to one vote; and articles of association shall be prepared and signed by all the subscribers of stock, embracing the following subjects among its fundamental provisions, to wit:

"(A) There shall be four thousand shares, of which one thousand shall be forever unassessable, and eight hundred of these shall belong to the shareholders of the Baltimore Mining Company, and two hundred to the new company; the remaining three thousand to be subscribed for, and the assessment paid as aforesaid.

"(B.) There shall be one president, one treasurer, and three trustees, who, together, shall constitute a board of directors, who may appoint their secretary, and manage the affairs of the company.

"J. H. Titus,

"President and agent of the Baltimore Mining Co.

"New York, Nov. 21st, 1846."

To this agreement was attached the following:

"We, whose names are hereunto signed, do hereby subscribe for the number of shares affixed to our several names, on the consideration and according to the full tenor and meaning of the foregoing agreement.

Nov. 21st.

| Names. | Residence. | Shares. |
|---|---|---|
| Hickok & Co. | New York. | 1600 |
| Wm. Pearsall, Jr. | " | 300 |
| Daniel A. Galloway, | " | 300 |
| J. T. Gilbert, | " | 100 |
| Horatio N. Davis, | " | 100 |
| Smith & Lambert, | " | 200 |
| C. Edgar Smith, | " | 100 |
| J. H. Titus, | Detroit. | 100 |
| Jacob H. Stoever, | New York. | 100 |
| E. Birdsall, | " | 100 |
| | | 3000 |
| Unassessable, | | 1000 |
| | Shares, | 4000" |

Titus, in pursuance of the arrangement contemplated by

his agreement, assigned and transferred the leases to Wm. Hickok, and the latter executed the following instrument, which was delivered to the complainant:

"As a part of the consideration for the sale and transfer of leases 267 and 269 of mineral lands, by the Baltimore Mining Company to William Hickok, I do hereby agree and promise that, on the formation of a mining company on said leased lands, 800 shares of unassessable stock shall be issued to the president of the Baltimore Mining Company, to be endorsed by him, and distributed among the shareholders of the Baltimore Mining Company *pro rata* to their number of shares; said unassessable shares to be numbered from one to eight hundred, both inclusive; said new company to be organized and the stock issued within sixty days from date.

New York, Nov. 23d, 1846, Monday evening, 10 o'cl'k.

WM. HICKOK, assignee of leases."

The $4,500 was paid to complainant, and, as contemplated, a new company was formed by Hickok and his associates (including all who signed the undertaking attached to the Titus agreement except Titus and Stoever) by articles of association bearing date November 30, 1846, under the name of "Vulcan Mining Company." The stock was by these articles divided into 4000 shares, 1000 to be unassessable, 200 of which should be the property of the company when sold, and 800 to "be allotted and transferred to the Baltimore Mining Company." And they declare their purposes to be the prosecution of mining operations on the tracts or parcels of land so purchased, or on any other lands in said mineral district that might be leased, located, or bought by the association for mining purposes.

Wm. Hickok was the treasurer and one of the largest shareholders of the Vulcan Company, and from its first organization appears to have been the most active and influential of its directors.

In the spring of 1847, Samuel O. Knapp was appointed

local agent of the Vulcan Company, and with a small number of men went upon these locations, and made explorations and examinations for mineral until the autumn of that year, without success; the entire amount found during the season being only a few pounds.

From such examination, and a more intimate acquaintance with their geological formation, Knapp became satisfied that there was no prospect of finding upon either of these tracts copper or other mineral in sufficient quantity to warrant any further outlay of money in seeking it there. His examinations below the surface, in various places, revealed the fact that these locations were not underlaid with the copper - bearing trap rock, but with a species of sand stone, in connection with which that mineral is not likely to be found in abundance.

While engaged here, in July, 1847, Knapp received from Hickok instructions to go and make an examination of the Algonquin Mine, which was some sixteen or eighteen miles distant from the Vulcan locations. He went there and made his examination, and on his way back followed the trap range which led him across the Ontonagon location, numbered 98. He saw where the Ontonagon Co. had been at work, and paid considerable attention to the character of the rock and the vein stone there, and became satisfied the location was a valuable one for mining purposes.

George C. Bates was a director and acting agent for the Ontonagon Co. in the city of Detroit. In September, 1847, Knapp started from the mining region, for New York, and on his way, called at Detroit on Mr. Bates, and learned from him that the whole or part of location 98 was offered to be sold, and that negotiations were pending with a third party for the transfer of it, and that, if such negotiations should fail, it might be purchased by other parties. On his arrival in New York in the latter part of September, he had an interview with Hickok, and informed him of his poor success in mining, &c., and on the 20th of that

month a special meeting of the Vulcan Company was held, which Knapp attended. At that meeting he exhibited to the stockholders what copper he had found, as the result of his operations for that season, and gave an account of the discouraging prospects of their adventure in mining. He also informed them of his examinations and inquiries in regard to location 98, and expressed to them his confident belief that it was a valuable one, and advised them to purchase it if practicable.

At that meeting, after a discussion of their affairs, it was resolved,

First: That the company should continue their mining operations during the ensuing winter, under the direction and superintendence of Mr. Knapp.

Second: That Mr. Knapp be requested to furnish the trustees forthwith an estimate of the probable expense of prosecuting the said operations until the first of June then next; and

Third: That Mr. Knapp be instructed to make inquiries at Detroit and elsewhere, on his return, as to the possibility of purchasing the whole or a portion of the Ontonagon Company's location, and to communicate to the company as soon as possible such information as he might be able to obtain upon the subject.

With respect to the proceedings and discussions of the members at this meeting, and the authority intended to be conferred upon Knapp as to the purchase of the Ontonagon location, the testimony of the members was contradictory; Galloway's testimony going to show that Knapp was expected to make the purchase, and Hickok, Barry, and others, testifying that decided opposition was expressed to the purchase being made, for several reasons; and among others, because complainant and the Baltimore Co. were to be benefited by it. Barry says:

" Mr. Hickok was in favor of an immediate purchase, if possible, and advocated giving full power to Mr. Knapp

to make the same at once on behalf of the Company. This proposition was strongly opposed by several of the other members present, particularly Pearsall, C. E. Smith, and myself; one of the grounds of our opposition was, that if the Vulcan Co. made such purchase, the Baltimore Co. would have an interest therein, without contributing a cent of the purchase-money, or being liable to assessment for carrying on mining operations; that we had already been subjected to great loss by investment in the Vulcan Co. on the misrepresentations of Titus, and were under no obligations to purchase another location and spend more money for his benefit. For myself, I was opposed to it for the additional reason, that I could not afford to lose more money, and was afraid to risk any further investment in an enterprise which appeared to be so very uncertain in its results. Mr. Hickok evinced considerable feeling because his views were not favored by the meeting, and, in order to conciliate him, I suggested that time should be allowed to think and talk the matter over; that I had no objections that Mr. Knapp, on his return to Detroit, might be instructed to make inquiries, and ascertain whether the purchase of No. 98, or a part of it, could be made, and report to the company, by which time we should probably be better prepared to act definitely on the subject: I, therefore, by way of compromise, offered a resolution to that effect, which, after some opposition and much discussion, was finally adopted unanimously by the meeting. This was the only authority ever given to Mr. Knapp by the Vulcan Co., to the best of my knowledge and belief, touching the question."

The following letter was put in evidence by complainant, and refers to the contemplated purchase:

"NEW YORK, Sept. 21, 1847.

"FRIEND TITUS,

Dear Sir: — Your favor by our friend Mr. Knapp was handed us in due time. We were much pleased with

your assistance to Mr. Knapp in negotiating draft. We take the liberty of asking a similar favor again. We have some $800 to raise for Mr. K. to proceed with his work this coming winter.

So far, Mr. K. has not been able to strike a vein, but we have not lost our confidence in that or the Baltimore location; and if Mr. K. should suspend operations temporarily on the Vulcan locations, it will be because he thinks veins already exposed can be purchased at less expense than he can find one on our location.

Mr. K. has a kind of a *carte blanche*, to operate as he deems will best serve the interests of the stockholders.

In regard to the location spoken of, we have left the matter with Mr. Knapp, if possible, to make his negotiations in Detroit. We should like very much to see the Baltimore and the Vulcan Co. on them hard at work.

If it can be purchased, we shall see that there is a smelting furnace put up there next summer.

We have, and so have the Vulcan Co., the fullest confidence in Mr. Knapp's operations; and if he can strike a rich vein, he will put the company inferior to none on the mineral region.

We shall probably write you early as day after to-morrow. We have some further favors to ask of you — to see if you can purchase certain stocks in your market, which we will name hereafter.

Yours, Truly,

Hickok & Co."

On the day of the date of this letter, a meeting was held, of which the following is the record on the books of the company.

"At a meeting of the trustees of Vulcan Mining Co., held this day at the office of Messrs. Hickok & Co. — present Messrs. Hickok, Pearsall, Smith, and Barry.

Mr. Pearsall was called to the chair, and Mr. Barry appointed secretary, *pro tem.*

Mr. Knapp having presented the estimate of expenses required for prosecuting the operations of the company until the first of June next (in accordance with a vote of the company to that effect passed at a special meeting held on the 20th ultimo), on motion, resolved,

1. That the trustees proceed forthwith to call in the balance due on the last assessment authorized by the company, being twenty - eight (28) cents per share.

2. That the following sums, comprising the aforesaid estimate furnished by Mr. Knapp, be, and are hereby, appropriated for the purposes named therein, and that the treasurer be authorized to disburse them accordingly as soon as required — amounting in all to eight hundred and five 58 - 100ths dollars, viz.:

| | | |
|---|---|---|
| For outfit and supplies for 6 men to 1st June next, | $242 58 | |
| Wages due to men, | 263 00 | |
| Mr. Knapp on acct., | 100 00 | |
| Mr. Knapp, for expenses of freight and transportation, and contingencies, to be accounted for by him, | 200 00 | |
| | | $805 58 |

The meeting then adjourned."

Knapp, after this meeting, returned to Detroit, having first had, according to his testimony and that of Hickok, conversation with Hickok about the opposition manifested on the part of the Vulcan Co. to making the purchase of location 98, in which Hickok expressed himself very anxious that the purchase should be made by the Vulcan Company, and confident that, if Knapp could make a favorable bargain with Bates for the purchase of the whole or a portion of the Ontonagon Company's location, the Vulcan Company would accept it. Hickok, therefore, instructed Knapp to make such a contract for the purchase, if possible, and send it to him at New York, assuring Knapp that he would attend to having the business closed

up there, while Knapp should go on up the lake and prosecute his mining operations. Accordingly, Knapp proceeded to Detroit and entered into a contract with Bates, assuming to act as agent of the Vulcan Mining Company, for one half of location 98, at the sum or price of $1,600, to be paid by the company, and sent it by mail to Hickok.

In the negociations attending the making of this contract, Knapp appears to have had the assistance of complainant, and to have consulted with Mr. Conger, a member of the Baltimore Company.

After making this contract, Knapp purchased supplies and provisions in Detroit for the miners, and went up to take possession of the new location in behalf of the Vulcan Company. On his arrival at the Saut he found that there would probably be difficulty in getting possession, and under the advice of Mr. Harvey, and Col. McNair, the mineral agent of the United States, he returned to New York in order to have the purchase fully consummated and closed up with the company, so that proceedings might be had, if necessary, to dispossess those who were wrongfully holding possession of the location.

Immediately on the receipt of Knapp's letter, which enclosed the contract with Bates, and also a letter from Bates, Hickok addressed to Bates the following letter:

"NEW YORK, October 12th, 1847.

"GEO. C. BATES, Esq., Detroit.

"*Sir:*—Yours of the 5th inst., to Mr. Samuel Knapp, was forwarded to me, together with your agreement with Mr. Knapp for the sale of one half of location 98, on the Ontonagon River, belonging to the Ontonagon Mining Company. Mr. Knapp was duly authorized to make any purchase for the Vulcan Company that he deemed best for their interest; and in the purchase of one-half of the Ontonagon location, the trustees approved of his course.

The request to be complied with in your letter, will be attended to in a few days.

Mr. Knapp omitted to give your authority for the sale of this location. When I forward the certificate of deposit, I will also send · a special power of attorney, for you to have executed by the trustees of your company, for you to convey to the Vulcan Mining Company the one-half of said location.

Very respectfully yours,

"WM. HICKOK, <em>Treasurer.</em>"

Hickok claims that, when he wrote this letter, he believed the company would ratify the contract Knapp had made. A meeting of the company was had the next day, and the papers, including Hickok's letter to Bates, submitted; when the following action only, so far as appears by their records, was had:

"NEW YORK, Oct. 13th, 1847.

"At a special meeting of the Vulcan Mining Co., held this day at the office of Messrs. Hickok & Co.— present Messrs, Hickok, Lambert, J. M. Smith, C. E. Smith, E. C. Roberts, Pearsall, and Galloway. Mr. Roberts was called to the chair, and Mr. Galloway appointed secretary *pro tem.*

The minutes of the last meeting were read and approved.

Communications were presented, and read, from Mr. Knapp, agent of the Company, from Geo. C. Bates, Esq., of Detroit, and Jonas H. Titus; all of which, on motion, were directed to be entered on file."

Considerable contradictory evidence was given as to the proceedings at this meeting, and Hickok testified that he was censured severely for writing the letter to Bates, above given. Galloway testifies with respect to the purchase, as follows:

"I have some knowledge of the purchase, by said Vulcan Mining Co., of part of the tract of the Ontonagon location. I think it was No. 98. This purchase was made, I think, in the fall of 1847. Mr. Knapp came to New York,

and his operations, he stated, on the Vulcan Co.'s location had not proved successful; and he stated he was not willing to go back without special orders from the company, as he seemed to have his fears about striking a vein of copper; but stated if they would purchase a portion or the whole of the Ontonagon location, he was satisfied he should be successful; that he had examined it, and it had exhibited a great show of copper. The question came up then before the Vulcan Co., as to the propriety of going on with the mining operations — of extending the business for the purpose of mining. Mr. Knapp was authorized by the Vulcan Co. to make the purchase. He did so, as the matter was understood in the office of the company. As I understood it, he went up for the purpose of purchasing, and did purchase this location of George C. Bates, one of the trustees of the Ontonagon location. Mr. Hickok stated that it would be best to keep in with Mr. Titus, as he could be of great service in accomplishing the purchase. After the conclusion of this matter, some of the Vulcan Co. did not want Titus to have any thing to do with it, and it was talked about changing the matter after it was concluded. William Hickok thought the best way would be to undo that bargain, and have the matter taken out in his own name; namely, the leases conveyed to him, and he would turn them over to the parties of the company; and it was done so, as I understood. Thence sprung the Minnesota Co." C. E. Smith, Roberts and Pearsall were sworn as witnesses for defendant, and their testimony went to support that of Hickok. Smith says:

"On the 13th October, I was present at another meeting, when, for the first time, I heard that Mr. Knapp had made a contract with the Ontonagon Company to purchase half of its location, thereby exceeding the power given him by the resolution passed at the meeting of the 20th September. I opposed this contract at the time, and all and every measure that tended towards the company's making

a purchase of any new location. I also heard a letter read, written by Hickok to Geo. C. Bates. I censured him for so doing, on the ground that he had no right to write such a letter without conferring with the trustees. As a trustee and a stockholder I disapproved of the letter. All the other members present took the same grounds, except Mr. Roberts, who was president of the meeting. I believe he did not express an opinion on the matter. One of my reasons for opposing the company's making the purchase was, that the company was in debt, and the trustees were prohibited by their articles of association to run in debt, or to incur any obligation of debt, without a vote of the stockholders. There had been no such vote, and I was unwilling as a trustee, to lay myself individually liable for the benefit of others."

Knapp again went to New York about October 27th, 1847, and while there, it was arranged that he should return again to Detroit, and take a transfer of one-half of location 98 to Hickok, in his individual name; which was done accordingly; and by an assignment duly executed by the trustees of the Ontonagon Mining Company, and acknowledged by them on the 8th day of November, 1847, an undivided one-half of location 98 was duly assigned, transferred and set over to William Hickok, with a stipulation as to a division of the same with the Ontonagon Co. and the right in Hickok to the choice of one-half when a division should be made by a line drawn through the middle.

In thus closing up the matter with Bates, Knapp again had consultations with Conger and complainant, but as to what was said the evidence is again conflicting. Conger says Knapp "told me that the Vulcan Mining Co. had purchased, or made arrangements to purchase, one-half of location No. 98 — such one-half as they should elect to take. He said, by an understanding with the members of the company in New York, the interest in said Loca-

tion No. 98 was to be assigned to said Wm. Hickok in trust for the Vulcan Mining Co., and mentioned as a reason for this mode of assignment, that Hickok had made advances for the expenses, &c., of the company, and proposed to make still further advances, and wished to take a transfer of the interest to himself in trust, by way of securing himself for these advances. I think I had a statement in writing from Mr. Knapp, signed by himself as agent of the Vulcan Mining Co., setting forth the above facts as to the transfer to Hickok, and the reasons why he wished it so made. I have since repeatedly searched for this paper among my files and papers, but have been unable to find it, and conclude that it has been lost. If my impression is wrong as to having actually received such a paper from Mr. Knapp, I am confident that he repeatedly offered to execute a memorandum in writing, embodying the above mentioned facts as to the transfer in trust to Mr. Hickok, and the reasons for such transfer.

"Mr. Knapp consulted Mr. Titus, because he was president of the Baltimore Mining Co., and represented the interest of that company in the Vulcan Mining Company— that interest being a right of the president of the Baltimore Mining Co., for said company, to a certain number of shares in said Vulcan Mining Co. I was a member of the Baltimore Mining Co., and was interested also, through the agreement of the president of that company with the Vulcan Mining Co., in 'said latter company; and the reason why I at first objected to the assignment in trust to Hickok, was because of my aforesaid interest in said Vulcan Mining Co. through the Baltimore Mining Co. I was anxious that the portion of the location sold should distinctly and clearly appear to be the property of the Vulcan Mining Co., so that there should be no question about the rights of the Baltimore Mining Co., under its interest in the Vulcan Mining Co. The effect of this proposed assignment to Hickok upon the rights of the Balti-

more Mining Co., under its claim to stock in the Vulcan
Mining Co., was a particular subject of conversation be-
tween myself and Knapp at the time above referred to;
and Mr. Knapp then distinctly stated, that as the pur-
chase was for the benefit of the Vulcan Mining Co., the
assignment to Hickok in trust for them would leave the
rights of the Baltimore Mining Co. the same as if the as-
signment had been made directly to the Vulcan Mining
Co.; and it was distinctly to show this that he either did
give, or offered to give, the paper to which I have above
referred. Upon this understanding only I consented that
the assignment should be made in that form. I and Mr.
Titus had been active in aiding Mr. Knapp in the prelimi-
naries of this purchase. It was the understanding with Mr.
Bates, the representative of the Ontonagon Co., owning
Location 98, before Mr. Knapp went to New York, that
the Vulcan Mining Co. should have the privilege of pur-
chasing one-half of said Location No. 98, and that Mr.
Bates had agreed with Knapp to assign one-half of Loca-
tion 98 to the Vulcan Mining Co. It was further under
stood at the same time, between Mr. Knapp, Mr. Titus, and
myself, that if the Vulcan Mining Co. wished the Baltimore
Mining Co. to take and pay for one-half of this purchase
in connection with them, they would assent to such an ar-
rangement; but the Vulcan Mining Co., it was understood,
had the privilege at the same time of taking the whole of
said purchase. For these reasons, I supposed that myself
and Mr. Titus could have prevented the assignment of the
above purchase to any other than the Vulcan Mining Co."

Knapp says, "When I got [to Detroit], I think I met
Conger and complainant there. I had some talk with them
about what had transpired in New York. Had a good deal
of talk with Conger, but not much with complainant, as he
had just lost his wife; but I saw him. I think I told Con-
ger what had transpired in New York, and how I was to
have the papers made out — the transfer from the Ontona-

gon to Hickok. Conger very strongly objected to the way in which the papers were to be made out, and seemed very much displeased with the way they were to be executed. He said that, in the way the papers were to be executed, it just cut off the Vulcan and Baltimore Cos. entirely. I told him that I was satisfied that it would all be right, and that the Vulcan Co. would finally have the purchase. I told him that I believed if the Baltimore would pay their proportion — their *pro rata* to the eight hundred shares which they had in the Vulcan Co. — that the Vulcan Co. would take the location off of Mr. Hickok's hands. I told them I should be willing to do this, so far as I was concerned; and I think they both said they would be willing to do it too. I don't recollect all that was said. There was a good deal of dissatisfaction expressed, especially by Mr. Conger. Mr. Titus (complainant) further promised that he would go down as soon as he could get time, and attend to it. I thought if he would do that, there would be no obstacle, but what could be removed, to the Vulcan Co. making the purchase of Mr. Hickok. Feeling this assurance, I did all I could towards removing Conger's opposition to having the papers executed in the way they had been thus far executed. I believe I offered to put my statements in writing; I think I did do so. I think I never *delivered* any statements in writing to him — am quite sure I never did. The statements in writing which I did make, I think I tore up after I got to Lake Superior. I don't remember all he said. There was some considerable contention between Conger and me — some disagreement on this point about the papers. Conger used some pretty sharp words. I do not remember whether or not he threatened to break up the contract with Bates, but I had some fears."

The above is but a portion of the testimony of these witnesses, but it is sufficient, without giving the rest, or that of others, to show the views and claims of the parties respectively in reference to the transaction.

Knapp immediately went on and obtained possession, and prosecuted mining operations thereon from some time in December, 1847, to about July, 1848, in the name of the Vulcan Mining Company, having removed from the location of the company their mining tools and implements, and transferred from one location to the other the men in the employ of said company, — continuing to employ them under contracts of the company.

April 18th, 1848, Knapp sent Bates the following:

"ONTONAGON, April 18th, 1848.

GEO. C. BATES, Esq.

DEAR SIR: On examination, the Vulcan Mining Company have selected the north half of Location No. 98, as their choice between the two halves.

Yours, &c.

SAMUEL O. KNAPP, *Agent.*"

The purchase of the Ontonagon location was paid for by Hickok & Co.,—complainant, at their request, signing, as drawer of one and endorser of the other, two of the drafts by which payment was made. It was proved that, from time to time before, they had advanced moneys to aid in carrying on the mining operations of the Vulcan Co., and that on various occasions after this purchase, they had assumed that it was made for that company.

The following letter is alluded to in the opinion of the Chief Justice:

"NEW YORK, Oct. 30th, 1847.

"JONAS H. TITUS, Esq.

"*Dear Sir:* — Your favor, by friend Knapp, was handed me in due time. Mr. K.'s return was quite unexpected; but I think his course a very prudent one, and of the highest importance to the company. I have the following proposition to submit to you, which can be carried out, and with the same benefit to you and our firm. It is this: It shall be represented by others that your company has abandoned its location, which you can credit. I will make the

same representations here, and manage to buy up all of the stock. During this time, however, your company can be at work on such part as Mr. Knapp will set aside for it, on the Ontonagon location. You and I will arrange the preliminaries with regard to purchase of a part of location purchased from Ontonagon Company. You can then submit the proposition agreed upon, and I will put it through for you. I think this plan would be as advantageous for your company, and such a course would be more satisfactory to the members of our company, so long as they did not know the object, which, of course, they could not. The stock in the Baltimore could not be lessened any in value by such a course, and it would give you and ourselves a chance, who has stood the heaviest expenditure of the company, to make something by the operation.

" Please let us hear from you by return mail, and state if this course meets your views.          *          *          *

Yours, truly,

" WM. HICKOK.

" Confidential between ourselves, Mr. Knapp and Mr. Conger."

The following action of the Vulcan Co. appears from its records :

" At the annual meeting of the stockholders of Vulcan Mining Company, held December 6th, 1847, the following preamble and resolutions were adopted :

" *Whereas*, The trustees of this company have reported to this meeting the fact of Mr. Knapp having left their location, and ceased his mining operations thereon ; Therefore,

" *Resolved, first*, That the meeting do not consider it expedient to resume their mining operations at present.

" *Resolved, second*, That Mr. Knapp be required to furnish the company, forthwith, with his accounts fully made up to the date of his leaving said location, together with a statement of all balances due to workmen, &c., up to

8 MICH—O

the same period, and an exact inventory of the property and effects of all kinds belonging to the company."

From the time when Knapp removed from the Vulcan Company's locations in the fall of 1847, all mining operations thereon ceased, and they have never been resumed; but that company has never been dissolved, and still continues to exist.

On June 1st, 1848, the principal shareholders of the assessable stock of the Vulcan Company, in order to possess themselves of the benefit of the Ontonagon purchase, and at the same time exclude the shareholders of the Baltimore Company from any participation therein on account of their right to shares of unassessable stock of the Vulcan Company, proceeded to organize themselves into a new company by the name of "The Minnesota Mining Company, of New York," under articles of association, and by that name they received an assignment from Hickok of the purchase. This company was afterwards incorporated by an act of the Legislature.

The assignment from Hickok recited, that he held the purchase from the Ontonagon Co. " as trustee for himself and the persons who have formed" " the Minnesota Mining Co. of New York," and acknowledged a nominal consideration only. And the association in their articles recite their "having purchased, though William Hickok, the right" under the lease of Location 98.

The property of the Minnesota association was divided into 3,000 shares, none of which were made unassessable. This company was composed almost exclusively of those who were interested in the assessable stock of the Vulcan Mining Company, and they had in it, for the most part, the same shares they had in the Vulcan. In the fore part of July, 1848, they assumed the possession and control of the new location, and have ever since been engaged in mining thereon, with very satisfactory results. Since their organization the Minnesota Company have always refused

to recognize any right on the part of the Baltimore Mining Company, or its shareholders, or of the complainant as president or trustee, or otherwise, to claim any part of its capital stock, property or effects, or to receive any share of the profits of their operations or business.

November 7th, 1849, complainant filed his bill, setting forth that the Vulcan Company never issued to him the 800 shares of stock according to their agreement, or any part thereof, or to any other person for the Baltimore Company; that the purchase of Bates was made for the Vulcan Co. with a full recognition of his rights and interest in the purchase, by virtue of the right to said stock; that the Minnesota Mining Co. was formed with the intention of carrying on, under its name, the mining operations of the Vulcan Co., and for the purpose of defrauding complainant of his rights against the Vulcan Co.; that the change from the Vulcan to the Minnesota Co. was merely nominal, while the interests of the shareholders of the new company remained substantially the same that they were in the old, and all the property of the Vulcan Co. was transferred to the Minnesota, without consideration; that the transfer to him or to the Baltimore Co. of the 800 shares of stock in the Vulcan would now be of no value, and a mere mockery of rights; that the Vulcan Co. is now to all practical purposes dissolved and dead, and the Minnesota fraudulently and collusively substituted in its place, and is now in fact and in truth the old Vulcan Mining Company, carried on under the act of incorporation obtained by them; and that the corporators of the Minnesota, at the time of the transfer of said location 98 from the Vulcan Co., were well aware of the agreement and obligation of the latter to convey said stock to complainant, and the Minnesota Co. is now liable to complainant in the same manner as the Vulcan Co. was. And praying that said Minnesota Co. might be decreed to issue and deliver to complainant, as president of the Baltimore

Mining Co. for the use thereof, one-fifth of the shares of the whole capital stock of said Minnesota Co., made unassessable forever, and to account to complainant for their earnings and profits.

The answer admits the arrangement between Titus and Hickok and his associates, as stated in the bill: "admits, that it was contemplated that the interest of the said new company proposed to be formed should be divided into four thousand shares of stock; and that said Hickok and others, as a part of the consideration of said assignment of said lease, agreed to and with the complainant, as president of the Baltimore Mining Company, that, upon the formation of said proposed new company, eight hundred shares of unassessable stock in the same, to be numbered from 1 to 800, inclusive, should be issued to the president of the Baltimore Mining Company, to be endorsed by him, and distributed among the shareholders of said company; and that said new company should be organized, and stock should be issued, within sixty days after the date of said agreement;" and admits also the organization of the Vulcan Co. as alleged.

The answer also admits the bargain by Knapp, assuming to act as agent for the Vulcan Co., with Bates, for the half of location 98, but says that the company, dispirited by their bad success, declined to ratify his action, and that the purchase was subsequently made by Hickok on his own private account; that at that time this location had no fixed or marketable value; that the little labor which had been performed upon it by the Ontonagon Co. had failed to develope any valuable mineral veins thereon, and that company had become dispirited, and nearly abandoned working; that its value for mineral purposes could then only be judged of by surface indications, which have always proved extremely unreliable; that before this could be determined, the expenditure of much capital and industry was required, and that it was then, owing to the many failures of mining

adventures on Lake Superior, extremely difficult to induce capitalists to engage in such hazardous undertakings.

The answer denies that the Vulcan Co. ever carried on, or directed or authorized to be carried on, any mining operations on location 98, in their name or for their benefit; says that the Vulcan Co., discouraged by its ill success and fruitless expenditures, has never resumed its mining operations since December, 1847, but has never been in any way dissolved, and still exists in fact as well as in name, still retains all the interest it ever had in mineral lands, and were the prospects sufficiently encouraging, has the same capacity as formerly to prosecute mining operations thereon; and it denies the identity of defendant with the Vulcan Co., or that the Minnesota was formed for the purpose of carrying on the operations of the Vulcan.

The answer further alleges, that the Minnesota Company has expended upwards of $110,000 in mining operations and improvements connected therewith on said location 98; over $30,000 of which was expended before the Minnesota Co. was made aware of the claim now set up by complainant. It states, on information and belief, that the Vulcan Co. has ever been and still is ready to issue and deliver the 800 shares of stock to Titus according to their agreement, and that in or about the month of June, 1847, the same was made out and offered to complainant, who declined to receive the same. And it prays the benefit of a demurrer to the bill.

*S. A. Goodwin, M. Wisner,* and *G. V. N. Lothrop,* for complainant:

*Mr. Goodwin :**

The objection for want of parties, taken for the first time at the hearing, is dilatory only. For if good, the court would order the cause to stand over to bring them in, and without costs: — 1 *Barb. Ch. Pr.* 321 *and cases cited.* . Or

---

* An abstract of the briefs is given on the question of parties only.

it would disregard mere formal parties, and decide the case on the merits: — 1 *Sumn.* 173 ; 1 *Stock.* 401.

But the shareholders of the Baltimore Co. are not necessary parties. Titus is trustee for them. Their rights exist against him as trustee, and he is, by the terms of the arrangement, to distribute the stock to them *pro rata*, and endorse the same over to them. A trustee filing a bill to collect the trust fund, or obtain possession of the trust property, need not make his *cestui que trust* a party : — 4 *Paige*, 34 ; *Story Eq. Pl.* §157 ; 2 *Gray*, 280 ; 1 *Beavan*, 91 ; *Calvert on Parties*, 212, 215 ; 5 *Hare*, 272 ; *Wal. Ch.* 465, *and cases cited ;* 10 *S. & M.* 301 ; 3 *Ves.* 76 ; 1 *Ves. Sr.* 101 ; 1 *Stew. & Port.* 467 ; 4 *Hare*, 126.

The Minnesota Co. is composed of the Vulcan partners, except Titus. It has received the property and profits of the excluded partner, subject to all equities. By becoming incorporated for their own convenience, they could not deprive him of vested rights, but became liable in their corporate name : — 16 *How.* 327 ; *A. & A. on Corp.* §§ 6, 379, 381, 382, 391.

*Mr. Lothrop :*

In equity the rule is that all persons must be made parties whose presence is necessary to make a complete decree : *Story's Eq. Pl.* § 76. Beyond this there is no absolute rule or principle : — *Ibid.* § 76c, § 77. And the bill may be so framed, as to scope or relief, as to dispense with parties who would be otherwise necessary : — *Ib.* §§ 214, 214a. And a mere nominal or formal party may be dispensed with where the objection is only taken at the hearing, though such party might be properly joined : — *Ib.* § 221 *and cases cited*, § 642 ; *Kean v. Johnson*, 1 *Stockt.* 423.

It is well settled that a *cestui que trust* is not always a necessary party to a suit brought by the trustee ; and I take it that the true and reasonable distinction is this : Where the bill is for the purpose of the *execution* of the trust, or its *object* is to destroy the trust, or trust property, the

*cestui que trust* is a necessary party. But where, in the language of Ch. Manning, it is "no part of the object [of "the bill] to affect the existence of the trust, or the trust "property, *except to place it in the hands of the trustee,* "*who can not till then execute the trust,*" it is not necessary to make the *cestui que trust* a party: — *Morey v. Forsyth, Walk. Ch.* 467. And this, I take it, is the result of the discussion on the subject by Calvert in his Treatise: — *Calvert on Parties, pp.* 7, 8, 210, 211. And it is fully confirmed by the case of *Hall v. Sullivan R. R. Co., Law Rep. July,* 1858. It was unquestionably the adjudicated law of the state when this bill was filed: — *Sill v. Ketchum, Harr. Ch.* 423; *Cook v. Whalen, Harr. Ch.* 443. These cases, with those referred to in the brief of Mr. Goodwin, seem to me to dispose of this question.

The decree in this case asked for would, if granted, merely put the trustee in a position in which he might proceed to execute the trust. The sole right involved in this suit is, whether he is entitled to receive the stock claimed, or its equivalent. What he shall do with it, or what are the rights of the *cestuis que trust,* is not at all involved. Every party necessary to the consideration of this *one question* involved, seems to me to be before the court. As to this question, Titus is the *representative* of the *cestui que trusts.*

But suppose it should appear that there are other persons who ought to have been made parties, what then? As the objection is made for the first time at the hearing on pleadings and proofs, it is not entitled to favorable consideration. Hence, if the party omitted is merely a nominal or formal one, the objection will not be allowed: — *Story Eq. Pl.* § 221 *and cases cited,* § 542. And in such cases the court will proceed to a decree if it can possibly do so: — *Story Eq. Pl.* §§220, 237, 541, 542; *Hanny v. Cooke,* 4 *Russ.* 34, 54; *Lambert v. Hutchinson,* 1 *Beavan,* 277; *Kean v. Johnson,* 1 *Stockt.* 401. And ad-

vantage can not be taken of the *non-joinder* of a co-defendant, unless it will operate to the prejudice of defend-ants: — *Story Eq. Pl.* § 257, *in note*.

But even if, to make a decree, it should be thought necessary to add parties, the court will, when the objection is taken at the hearing, allow the cause to stand over, with leave to amend the bill by making new parties, and connecting them with the case by making proper averments: — *Story Eq. Pl.* §§ 237, 541; *Milligan v. Mitchell*, 1 *M. & Cr.* 443; *Covert v. Jeffery*, 1 *S. & Stu.* 106; *Orton v. Knable*, 3 *Wis.* 601; *Bull v. Bell*, 4 *Wis.* 54; *Malin v. Malin*, 2 *Johns. Ch.* 238.

*S. T. Douglass, H. H. Emmons*, and *J. M. Howard*, for defendant:

I. *All the members of the Baltimore Company should be parties to the bill.*

There is no averment or proof of numerousness, and none that the bill is filed by one for or in behalf of all; nor is this a case where such a bill would be sustained if the averments were made: — *Calvert on Parties*, 41, 28, *et seq; Story's Eq. Pl.* §§ 94, 96, *et seq.*, 107, 115.

In order to bring a case within the exception to the general rule as to parties, the number of persons must be so great, or so liable to change, that to require all to be made parties by name would be a practical inconvenience, amounting almost to a denial of justice: — *Calv. on Part.* 39, 40; *Harrison v. Stewardson*, 4 *Hare*, 530; *Brainbridge v. Burton*, 2 *Beav.* 539. And the bill must show on its face that it is brought on behalf of all: — *Story's Eq. Pl.* §§ 95, 99, 107, 126; *Calv. on Part.* 31; *Douglass v. Horsefall*, 1 *Sim.* 81 *to* 184. And the facts relied upon, in order to dispense with making all parties by name, must be averred: — *Howland v. Baker*, 3 *Hare*, 74, 75. And, if traversed, must be proved on the hearing, or the bill can not be maintained: — 3 *Eng. L. & E.* 170.

In those cases where one or more persons are permitted to sue on behalf of themselves and others, all the persons on whose behalf the suit is brought, as well those named as complainants as those who are not, are regarded as parties, and may participate in all proceedings until its final termination:— *Daniels Ch. Pr.* 1664; *Story's Eq. Pl.* § 96. And the court institutes the proper inquiries as to who are the persons represented, and what are their interests, and in their decree determines the right of each, and distributes the fund in controversy to such only as come in and claim it:— *Good v. Blewett,* 19 *Ves.* 336; *Story's Eq. Pl.* § 99; *Weatherly v. St. George,* 2 *Hare,* 629.

The present bill can not be maintained upon the ground that it falls within the class we are considering. It contains no one of the requisite averments to bring it within that class. And the complainant will not, probably, claim that it is brought on behalf of all the Baltimore stockholders, since this would disqualify all his most material witnesses.

The bill, then, being one by the complainant solely, and under which he must show in himself the *legal title,* or a right to have conveyed to him the *legal title,* to the interests he claims, and a right to hold them, when so transferred, in trust for his beneficiaries, we proceed to show that, upon the pleadings and proofs, he makes no such case.

1.— *The contract is between Hickok & Co. and the members of the Baltimore Company directly. It is their contract in law, and not that of Titus in trust for them.*

This, we think, will appear from the literal meaning of the contract, from its legal incidents, and from its nature.

a.— *The words of the contract are unambiguous, and, in express terms, describe Titus as agent.*

The counterpart does not even mention Titus by name,

but says the shares are to be delivered to the *President of the Baltimore Company.* That as such agent he can not maintain suit, see *Blair v. Agar,* 1 *Sim.* 37; *King of Spain v. Wallack,* 6 *L. J. Ch.* 165; *Jones v. Hunt,* 1 *Hen. & Mumf.* 470.

b.—*Its legal effect is what its literal terms import — the contract of the company, and not that of complainant.*

The intention binds.— See *Randall v. Van Alstine,* 19 *Johns.; Detroit v. Jackson,* 1 *Doug. Mich.* 106; *Story on Agency,* § 154; 4 *Eng. L. & Eq.* 358; 11 *Eng. L. & Eq.* 430; 1 *H. & Nor.* 165.

Even if made with the agent personally, it having been for the benefit of the company, and the consideration having moved from the company, the stockholders of the company would have been necessary parties: — *Hook v. Kinnear,* 3 *Swanst.* 417; 2 *Spence Eq. Jur.* 286, 287; *Small v. Atwood,* 1 *Younge,* 407; *Chadwick v. Marsden,* 12 *Eng.* 18; *Crocker v. Higgins,* 7 *Conn.* 342.

The contract, by its terms and form, is *in law* the contract of the firm.

"As president and duly authorized agent," means no more than "as member of the *firm* and duly authorized agent." He contracts for the company then. Is this not the contract of the individuals of the firm, if they sanction it?

If the contract was by "John Doe, a member of and duly authorized agent of the firm of Doe & Co.," would this court patiently listen to an argument that this was his personal contract, in trust for his firm? That is exactly the case before the court.

c.—*The nature and subject of the contract render the idea of a trust wholly impossible. A trust can not be predicated of such a transaction.*

Of what does complainant claim to be trustee? The bill answers us. Of the shares of "*stock*" which Hickok agreed the Vulcan Company should deliver.

We make no apology for placing here the following truisms. We fight against nothing but what is with apparent soberness stoutly insisted upon by our learned opponents, and formally announced as the sole ground of equity in the bill against this defendant corporation.

The court will see, therefore, trivial as it may deem such an argument, that the great ground of difference between the litigants here, is not so much as to the principles of law in relation to parties, in the abstract. The complainant concedes he can not stand here as a partner. The sole strife is to impart to the words "stock" as used in the contract and bill, the quality of a *chattel;* the faculty of property; to make it a thing, instead of a mere certificate, or evidence, of an interest in some *other* thing. The whole theory of the bill, the conduct of the cause, and the argument which claims complainant is a *trustee,* is predicated upon the idea of the legal existence of some aggregate body with "*shares of stock,*" as distinguished from the natural persons, Titus, Hickok & Co., with their individual interests in the property of the firm. And, although counsel may disclaim an intention to confound things so completely distinct as a corporation and the natural persons which compose it, still the bill in terms so does, and it can be sustained on no other ground than that which involves the idea of ownership in "*stock*" independently of the property it represents.

The following are cited only to show the utter want of identity in the law of the stockholders and projectors of a corporation with the corporation itself, and that they are in no sense *owners* of its property; that they are not even beneficiaries or *cestuis que trust* within the meaning we are here considering:—*Ang. & Ames on Corp.,* §§ 307, 308, *and cases cited in notes;* 9 *Barr,* 27; 10 *W. & S.* 397; 4 *Paige,* 406; 3 *Comst.* 182; *Brooks v. Hill,* 1 *Mich.* 123; 2 *How.* 497; 39 *Eng. L. & Eq.* 32; *Redf. on Railw.* 634, §3; 12 *Vt.* 324; 16 *Pick.* 412; 15 *Vt.* 519; 28 *Vt.* 564.

Now what is signified in the contract and the bill by
"*shares of stock,*" is an *ownership in co-partnership pro-
perty*. He who holds them owns an undivided part in every
article and acre owned by the company. He does not hold
something distinct *from*, but an interest *in*, the capital.
He is joint tenant — is seized "*per my et per tout*" in all
its effects. They are but parts of the co-partnership agree-
ment between the members of the Vulcan and those of the
Baltimore Company; and when it was agreed they should
be delivered to Titus, it was not to invest him with a
title. They are not things of themselves; they are not
chattels, subject to larceny at common law, any more than
a receipt, or other certificate. They are, in no sense, the
subject of property, and so not of a *trust*. As well might
a man be said to be trustee of a *deed* which conveyed land
to another ; or of a receipt for money, which acknowledged
a past payment. Such instruments, owing to their very
nature; to the fact that the subject of ownership, and the
object of value, is the property or transaction to which they
*refer*, can not be the subjects of trust.

The case, then, is reduced to this : The complainant must
be *trustee* of the *act* or *agreement* by which he and his as-
sociates entered into co-partnership with Hickok and others·
Or it may be said that he entered into *partnership himself*,
in trust for his associates. If so, the law executes the trust,
and gives the beneficiary a present vested interest : — 10
*Met.* 349; 28 *Miss.* 432 ; 13 *S. & M.* 658; 1 *Smith Lead.
Cas.* 491.

Indeed, what would his beneficiaries be but dormant or
secret partners, if you follow out fully and literally the
transit of this title as complainant contends? If he took
the partnership interest *in trust*, this gave *in presenti*, a
vested actual interest in the whole community.

The idea that *partnership property* can be put into a
new joint association, and one of the firm hold the interest
growing out of this common contribution of capital *in trust*

for his fellows, without, in this court, making them co-partners with him, is not only erroneous, but at war with every elementary axiom in relation to trusts and co-partnerships.

2. *If we grant that the complainant is in any sense a trustee, he can not, in the circumstances of this case, maintain the bill without his beneficiaries. They must be co-complainants.*

We shall not stay to argue this upon principle: it is fully settled by the authorities: more especially does the rule apply where the bill, as here, is filed to *create* the complainant trustee: — *Kirk v. Clark, Pre. in Chy.* 275; *S. C. 3 Vesey,* 76, *note.* The case is literally applicable: — *Story Eq. Pl.* §§ 149, 215, 216, *note 5,* §§ 201, 205, 207, *note 1,* §§ 207a., 207b., 209; 1 *Ball & B.* 182; 2 *Sim. & St.* 184; 2 *Hare,* 628; 19 *Ves.* 336; 2 *Sim. & St.* 19; 1 *Sim. & St.* 106; 1 *Cr. & Ph.* 376; 4 *Hare,* 115; 17 *Ga.* 222; 1 *Green Ch.* 305; 1 *Paige,* 23; 2 *Johns. Ch.* 238; 2 *Stew. & Port.* 361; 2 *McLean,* 30; 3 *Hare,* 69; 1 *Dan. Ch. Pr.* 267, *and note to* 279; *Story's Eq. Pl.* §§ 207, 209.

Where property is given to a trustee for *cestuis que trust,* the court will pay it to the *cestuis que trust,* and not to the trustee: —2 *Hare,* 528; 19 *Ves.* 336.

Moreover, the bill prays for an account of past dividends, &c. The stockholders of the Baltimore Company are necessary parties to that account: — *Green v. Lisson,* 2 *Curtis C. C. R.* 171; 4 *Mylne & Cr.* 286.

The following case is much like that claimed to be proved by complainant: — 1 *Mylne v. Craig* 559, *Mann v. Malachy.*

II. *The members of the Vulcan Company are necessary parties.*

The complainant's equities are founded:

*First,* Upon an agreement to which the Vulcan Company is claimed to be one of the parties, which agreement the

court is asked specifically to enforce. As parties to the agreement, the Vulcan Company members are necessary parties.

*Secondly,* Upon an alleged conveyance by the Vulcan Company to the Minnesota Joint Stock Company, of the north half of 98, for the purpose of defrauding the Baltimore Company of its interest in the location. As parties to the alleged fraud, they are likewise necessary parties to the suit:— *Story Eq. Pl.* § 153; 1 *Meriv.* 240, 242; *Calv. on Part.* 19, 24, 80, 81; 39 *Eng. L. & Eq.* 225.

III. *For the same reason the stockholders of the Minnesota Joint Stock Company should have been made parties; for the joint stock company and corporation are not in law identical:*— 39 *Eng. Law and Eq.* 28, *and other cases cited ante.*

IV. *Hickok, if he held in trust for complainant, must be a party:*— *Story Eq. Pl.* § 211, 209 — If a trustee's assignment is a breach of trust, he should be made a party:— *Coop. Eq. Pl.* 3; 7 *Ves.* 3, 11.

In the last case it is said the trustee should be a party, because he will be made to stand as surety for having broken the trust.

*Story Eq. Pl.* § 155 — If assignor is *trustee,* and the assignment is breach of trust, then he must be a party. The proper decree is that he stand as security, &c. It appears to be a general rule that if *cestuis que trust* file a bill to pursue property sold with notice, the *trustee must be made a party:*—*Malv. on Part.* 207.

*Story Eq. Pl.* § 221 — If assignment is in fraud, trustee must be made a party.

These parties can not be dispensed with, even if it be practically a denial of justice to require them.

V. *As an account is sought of past dividends, the stock-holders pro tem., of the Minnesota Company, who had received dividends, were necessary parties, for they are*

*each of them bound to contribute one-fifth of the divi-
dends they have received:* — *Chitty Eq. Dig.* 25, 33,
§ 14; 6 *Railw. Cas.* 670; 12 *Beav.* 125.

MANNING J.:

Complainant claims, under a written contract, a right
to eight hundred shares of unassessable stock in the Vul-
can Mining Company, and has filed his bill for the stock
against the Minnesota Mining Company, an incorporation,
alleging they are one and the same company, or that
the Minnesota Company is the Vulcan Company under a
new name.

The testimony in the case does not sustain their iden-
tity. On the contrary, it shows the two companies are
not one and the same, but separate organizations, having
nothing in common between them. The Vulcan Company
is still in existence, and the owner of the mining loca-
tion purchased for it of the Baltimore Company.

It follows, as a necessary consequence, that for the
stock in question the bill should have been filed against
the Vulcan Company, instead of the Minnesota Company;
and that it should have been filed by the Baltimore Com-
pany, unless complainant is a trustee for the stockholders
of that company, under the agreement of the 21st No-
vember.

Is complainant a trustee under that agreement? To
solve this question recourse must be had to the agree-
ment itself, which is a contract between the Baltimore
Mining Company, by complainant as its president and
agent, and Hickok & Co. and their associates. It is not
a contract between the latter on one part, and Titus on
the other. This is not pretended; nor is there any ground
for such a claim, as complainant's agency is stated in the
contract itself. The leases to be assigned were the pro-
perty of the Baltimore Company, and the eight hundred
shares of unassessable stock were the consideration, in

part, of the assignment, and must be regarded as the property of the company, unless by some act of the company the stock was to be severed from its effects, and to become the individual property of its stockholders. No act of the company making such severance or distribution of the stock, or authorizing it to be made by complainant, is shown; and the provision in the contract for the delivery of the certificates of the stock to complainant, to be in harmony with the other parts of the contract, and come within the scope of complainant's authority, must be understood as an undertaking, and nothing more, on the part of Hickok & Co., and their associates, to deliver the certificates to complainant as the duly authorized agent of the company to receive them.

The supplementary agreement of Wm. Hickok, of the 23d November, is of no binding force whatever. There are several reasons why it should be discarded: 1st. It is an attempted alteration of the agreement of the 21st November, by Wm. Hickok alone, and not by Hickok & Co. and the other persons associated with him in that agreement; 2d. It is not supported or made binding by any new consideration passing between the parties to the original agreement; and, 3d. Its object would seem to be to give the unassessable stock to the shareholders of the Baltimore Company, instead of the company itself, and to create complainant a trustee to receive and make a *pro rata* distribution of it. As agent to sell, he had no authority, by contract or otherwise, to make a partition or distribution of the proceeds of the sale among the shareholders of the company. His authority "to make sale of the same (the leases), on such terms as he should think fit," conferred no such power. If I am correct in this, then it was not in the power of the complainant and the other parties to the agreement of the 21st November, had they all joined in the supplementary agreement, to have changed it in the manner indicated by the

latter agreement. Nor does the supplementary agreement appear to have ever been ratified by the Vulcan Company. By its articles of association, it is provided, in express terms, that the 800 shares of unassessable stock shall be "transferred to the Baltimore Mining Company."

For the reasons stated I think the decree should be affirmed; and I should feel it to be my duty to refrain from expressing an opinion on the case made by the evidence, if I could see that the rights of any one not before us might be prejudiced by it, although the cause was disposed of in the court below on its merits.

It was insisted, on the argument, that the Minnesota Joint Stock Mining Company was formed by a majority of the shareholders of the Vulcan Company, for the purpose of appropriating to their use, and to the exclusion of the other shareholders of the Vulcan Company, a mining location that the Vulcan Company had contracted to purchase of the Ontonagon Company.

The questions, who should be parties to such a case, and what relief should be given, and against whom, I shall not discuss, as I do not think the case itself is made out by the evidence.

By whom was the north half of location ninety-eight purchased? I use the word purchased as including contract to purchase, the sense in which it is used by the witnesses.

Galloway says in his testimony, that "Knapp was authorized by the Vulcan Company to make the purchase;" and that "he did so, as the matter was understood in the office of the company."

As to Knapp's authority to make the purchase for the Vulcan Company, Galloway is clearly mistaken, as appears from the resolution of the company under which Knapp acted, and the testimony of Hickok, Knapp, Barry, Pearsall, and C. E. Smith, all of whom were at the meeting of the stockholders at which the resolution was passed,

Galloway himself acting as secretary to the meeting, and signing the record. By the resolution, Knapp was "in-structed to make inquiries in Detroit and elsewhere, on his return, as to the possibility of purchasing the whole or a portion of the Ontonagon Company's location, and to communicate to the company, as soon as possible, such information as he may be able to obtain on the subject." No authority was given him to make any contract what-ever.

The resolution was passed under the following, circum-stances: Knapp, as agent of the Vulcan Company, had spent the preceding summer, with the workmen of the company in his charge, in making explorations for copper on the location purchased of the Baltimore Company, and had come to the conclusion that it was worthless for mining, and so stated to the stockholders at their meeting on the 20th September, at which the resolution was adopt-ed. At the same time he called their attention to the Ontonagon 'Company's location, which was for sale, and recommended its purchase. Hickok and Galloway, as well as himself, were in favor of making the purchase. But the other stockholders were opposed to it — some, because the Baltimore Company would participate in the new ad-venture without contributing any thing toward the pur-chase; and others, because they were unwilling, from the experience they had already had, to embark in a new adventure, attended with so much hazard, and, requiring a still further outlay of money. To this last class belonged Barry, on whose motion the resolution was passed. His reason for offering it and asking its adoption by the meet-ing we will give in his own words. He says: "Mr. Hickok evinced considerable feeling because his views were not favored by the meeting, and, in order to conciliate him, I suggested that time should be allowed to think and talk the matter over; that I had no objection that Mr. Knapp, on his return to Detroit, might be directed to make in-

quiries, and ascertain whether the purchase of No. 98, or a part of it, could be made, and report to the company, by which time we should probably be better prepared to act definitely on the subject. I, therefore, by way of compromise, offered a resolution to that effect, which, after some opposition and much discussion, was finally adopted unanimously by the meeting."

Knapp, on his return to Lake Superior from the city of New York, where the meetings of the company were held, stopped at Detroit, and made a contract with Mr. Bates for the purchase of one - half of the Ontonagon location. On the 5th October, he sent the contract, with a letter from Bates to himself, to Mr. Hickok, who resided in the city of New York, and on the 12th October, Hickok wrote Bates a letter, stating that "Mr. Knapp was duly authorized to make any purchase for the Vulcan Mining Company that he deemed best for their interest; and in the purchase of one - half of the Ontonagon location, the trustees approved of his course."

On the next day, or 13th October, there was a special meeting of the company, at which Galloway was present, and again acted as secretary. The record of the meeting, after stating that "the minutes of the last meeting were read and approved," contains the following entry only of business transacted at it:

"Communications were presented and read from Mr. Knapp, agent of the Company, from [Geo. C. Bates, Esq., of Detroit, and Jonas H. Titus. All of which, on motion, were directed to be entered on file."

Mr. Pearsall, in speaking of this meeting in his testimony, says: "On the 13th October, a meeting of the stockholders was held, and this agreement submitted to them" (the agreement between Bates and Knapp), "and a copy of a letter written by Wm. Hickok to George C. Bates" (the letter of the 12th October already mentioned). "I again expressed my decided opposition to this purchase, * * *

most of the stockholders agreeing with me: Daniel A. Galloway was one of them."

C. E. Smith, another witness, says : "On the 13th October I was present at another meeting, when, for the first time, I heard that Mr. Knapp had made a contract with the Ontonagon Company to purchase half of its location, thereby exceeding the power given him by the resolution passed at the meeting of the 20th September. I opposed the contract at the time, and all and every measure that tended towards the company's making a purchase of any new location. I also heard a letter read, written by Hickok to George C. Bates. I censured him for so doing, on the ground that he had no right to write such a letter without conferring with the trustees. As a trustee and stockholder, I disapproved of the letter. All the other members present took the same ground, except Mr. Roberts, who was president of the meeting. I believe he did not express an opinion on the matter."

If Galloway, when he says Knapp made the purchase "as the matter was understood in the office of the company," intends to be understood as asserting that the company approved of what Knapp had done, he is mistaken, as clearly appears from the testimony recited, as well as that of other witnesses to which I might refer.

Knapp left Detroit for Lake Superior soon after making the contract with Bates, to take possession of the Ontonagon location. He proceeded as far as the Sault, and then, for reasons which it is not necessary here to state, returned to the city of New York to see Hickok. In speaking of his interview with Hickok at this time, he says: " Mr. Hickok informed me that there was a general difficulty existing in the company; that the difficulty had increased since I was there, and they had refused to ratify the contract which I had made with Mr. Bates. I did not know what to do then. I talked with Mr. Hickok considerably on the subject, and told him, as I

had before, that I had a good deal of confidence in the location, and wanted to secure an interest in it, and wanted he should. I did the best I could to induce Mr. Hickok individually to go into the purchase. I had learned from him that the Vulcan Company had flared up. He thought favorably of doing it, but did not give an answer directly; said he would look at it, and see what could be done. I understood from him that he had talked with some of his business firm, and he finally said that he would go into it."

Knapp thereupon returned to Detroit, and consummated the agreement with Bates by taking a conveyance from the Ontonagon Company to Hickok. He was authorized to do so by Hickok, who furnished him with means to pay the purchase money.

At an annual meeting of the stockholders of the Vulcan Company, on the 6th of December, thereafter, the following preamble and resolutions were adopted:

" *Whereas*, The trustees of this company have reported to this meeting the fact of Mr. Knapp's having left their location and ceased his mining operations thereon; therefore,

"*Resolved*, 1st. That the meeting do not consider it expedient to resume their mining operations at present.

" 2d. That Mr. Knapp be requested to furnish the company forthwith with his accounts fully made up to the date of his leaving said location, together with a statement of all balances due to workmen, &c., up to the same period, and an exact inventory of the property and effects of all kinds belonging to said company."

The evidence referred to, with other evidence bearing on the same points, it seems to me, establishes beyond dispute the following facts: 1st, That Knapp was not authorized by the Vulcan Company to make the purchase. 2d, That with a knowledge of the existence of the contract, the company refused to ratify it. And, 3d, That after the

company had refused to ratify the contract, and not before, the purchase was made by Hickok, with more or less expectation, probably, on his part, that it would subsequently be taken off of his hands by the company.

Notwithstanding the resolution of the 20th of September, authorizing Knapp to make inquiries only, Hickok instructed him to make a bargain with Bates for the purchase of the location. And Knapp took possession of it, after its conveyance to Hickok, with the men under him in the employ of the Vulcan Company, and commenced and for several months continued to work it — giving them and others to understand it had been purchased by the Vulcan Company. It also appears, from the evidence before us, that complainant had reason to believe, from Hickok's letters and the statements of Knapp, that the purchase was made for the Vulcan Company. In answer to such and other like acts of Hickok and Knapp, or either of them, it is only necessary to say that they were wholly unauthorized; that they were not the acts of the Vulcan Company, or of its authorized agent, but the individual acts of Hickok or Knapp. Whatever effect, although unauthorized, might be given to them in a controversy growing out of them between the Vulcan Company and a third person, none whatever could be given to them in a suit by the Vulcan Company against the Minnesota Joint Stock Company. It must be borne in mind it is that view of the case I am now discussing, and that, for that purpose only, I take it for granted the same relief could be had against the Minnesota corporation as against the Minnesota Joint Stock Company. The Baltimore Company has not, and does not claim, any other right in the Ontonagon location, than what it is entitled to by reason of the eight hundred shares of stock it owns in the Vulcan Company. Its claim is based on the rights of a stockholder of the Vulcan Company; and if the Vulcan Company has no rights, its stockholders have none. The Vulcan] Company might have

ratified the contract made with Bates, but this it refused to do at the time, and there is no evidence before us that it was ever ratified. Having absolutely refused to ratify it at the time, it could not subsequently ratify it to the prejudice of intervening rights. Much less would it be allowed to show such ratification by proof of the subsequent unauthorized acts of its agents.

Our attention was particularly called on the argument to the following language in the preamble to the articles of the Minnesota Association, viz: "The undersigned, parties to this instrument, having purchased through Wm. Hickok," &c, ; and to the deed from Hickok to the company, which, after reciting the conveyance to him by the Ontonagon Company, states: "And whereas, the undersigned made and held such purchase for himself and the other persons who have formed an association called the Minnesota Mining Company of New York; and whereas, articles of association have been signed," &c.

While the parties to these instruments and those claiming under them would, in a proper case, be estopped from denying the truth of these statements — although from the evidence before us they do not appear to be true in fact — I am at a loss to perceive their bearing in the present controversy. They contain no recognition of a purchase by, or in trust for, the Vulcan Company; and there is not anything in the articles of association of that company, or in the nature of its business, to prevent, expressly or by implication of law, its members forming other associations for mining, or holding stock in as many different mining companies as they might think proper. And this being the case, Hickok or any other member of the Vulcan Company had a right to purchase the Ontonagon location in his own right. To suppose, therefore, that what took place at the meetings of the Vulcan Company on the 20th of September and 13th of October was intended, and was shaped with a view, to pave the way for such in-

dividual purchase, or for the subsequent formation of a new company, or for the purpose of thereafter changing the name of the existing company, would imply simulation without any motive, not in one or two persons, but in a majority of those present at these meetings. It seems almost absurd to accuse Hickok and Knapp of acting a false part at the meeting of the 20th of September; and here, if anywhere, the supposed inquity must have commenced. For they, and they alone, were in possession of all that was then known in regard to the Ontonagon location; and they communicated all they knew about it to the meeting, and urged its purchase by the Vulcan Company. And they were then, and still are, stockholders in the Baltimore Company. How far a knowledge of this last fact may have influenced the action of those who were opposed to the purchase, we do not know. All we know in regard to it is, that the purchase was opposed by some for the reason that the Baltimore Company would have an interest in it without paying any part of the purchase money. At the second meeting — the one held on the 13th of October — Knapp was not present, but Hickok was, and his conduct on that occasion was consistent with the part he took in the first meeting. He was still in favor of the purchase; and notwithstanding the reprimand he then received for writing to Bates as he did, he appears afterwards to have cherished a hope the company would yet make the purchase. On the 6th of December thereafter the Company resolved to discontinue mining, and it was not until the 6th of June following that the Minnesota Joint Stock Company was formed.

There is another important fact that should not be overlooked. When the purchase was made of the Ontonagon Company the location was not what it is now. It has derived its importance and value from what has transpired since. Its value at that time was speculative, and the low price at which it was purchased, $1,600, shows

the estimate placed on it for mining by the Ontonagon Company. It had been partially explored by that company, but the exploration had not been carried so far as to determine its ultimate value for mining. It has since proved to be one of the best mining locations in the Lake Superior country. It is this that gives the present suit the magnitude and importance so justly attributed to it by the parties. When the acts of men are impugned as not truthful, the magnitude of the benefit or advantage to be derived from them is a circumstance always to be taken into consideration, with other evidence, in determining the truth or falsity of the acts themselves. But it must be the magnitude of the benefit at the time the acts were done. Like a ticket in a lottery, the value of the ticket before the lottery is drawn, and not after the ticket has drawn a prize. Apply this principle to the meetings of the Vulcan Company of the 20th of September, the 13th of October, and the 6th of December, and how very small was the motive for making the acts of those meetings speak a falsehood. If there is anything false, it is not in the records of the meetings, but in the acts themselves.

The Vulcan Company was formed for mining on the location purchased of the Baltimore Company, and our attention was called to the following words in the articles of the company: "Or on other lands in said district that may be leased, located or bought by this association for mining purposes." These words, as I understand them, do not make it obligatory on the company, on the Baltimore location proving worthless for mining, to purchase or lease other locations. Besides, there is nothing in the agreement between the Baltimore Company and Hickok and others, of the 21st November, requiring the company to be formed in pursuance of it to assume such an obligation.

The decree of the court below, I think, should be affirmed.

MARTIN Ch. J., dissenting:

Objections to the bill were raised before us, and appear to have been made at the hearing below, also, for want of proper parties as complainants, and as defendants. I regard with disfavor an objection dilatory in its nature, which is not raised preliminarily by demurrer to the bill, but is suggested after the cause is put at issue, and the parties (as in the present case) have been put to the enormous expense of taking proofs, and preparing the cause for a hearing upon the merits; and with the more especial disfavor when such objection is not even pointed out in the answer. There is no equity in allowing a cause to pass off upon such grounds, thereby putting the complainant to the trouble and expense of instituting new proceedings, either alone or with others, and of re-taking testimony which has already been submitted to the court, upon which a decree upon the merits can be pronounced. Especially is there no equity in such a course in this case, where the merits were the foundation of the decree appealed from, and the question of a want of parties was only incidentally alluded to — so that the appeal is, in fact, from a decree dismissing the bill upon the merits.

The objections which I shall notice are, for a want of the Baltimore Mining Company as complainant, and of the Vulcan Mining Company as co-defendant: as that of the want of Hickok, and the stockholders of the different companies, will be necessarily disposed of by the view I take of these objections.

And first, as to that of the want of the Baltimore Company as co-complainant.

On the 21st of November, 1846, Titus, as president and agent of such company, agreed to sell to Hickok & Co., and their associates, two locations of such company, numbered 267 and 269. For these locations they were to pay $4,-500 on the proper assignment to them, or to the trustees of a company to be formed by them, of the leases of

such locations; and were to deliver to Titus proper certificates of one-fifth of the entire interest therein, and of the capital stock of a company to be formed for mining thereon, to be forever unassessable, and to be delivered to the shareholders of the Baltimore Company; and a company for mining purposes was to be formed in New York on the basis of such locations; the articles of association of which should embrace, among its fundamental provisions, one for the division of its stock into 4,000 shares, of which 1,000 should be unassessable, and 800 of these should belong to the shareholders of the Baltimore, and the remaining 200 to the new company.

Two days after, the leases of these locations appear to have been assigned to Hickok for the benefit of the contemplated company; and at that time, and undoubtedly as a part of the transaction, Hickok, as such assignee, executed to Titus, as a supplement to the articles of the 21st, an instrument which is as follows: "As a part of the consideration for the sale and transfer of leases Nos. 267 and 269 of mineral lands, by the Baltimore Mining Company to William Hickok, I do hereby agree and promise that, on the formation of a mining company on said leased lands, 800 shares of unassessable stock shall be issued to the president of the Baltimore Mining Company; to be endorsed by him and distributed among the shareholders of the Baltimore Mining Company, *pro rata* to their number of shares; said unassessable shares to be numbered from 1 to 800 both inclusive; [said new company to be organized, and the stock issued, within sixty days from date."

Accordingly we find that on the 30th of the same month, the Vulcan Mining Company was organized, by articles of association dated and signed upon that day, in which these agreements with the complainant are fully recognized, and provision made for their execution.

The contract therefore is, in my opinion, to be ascer-

tained from a construction of the instruments of November 21st and 23d as one. I do not regard that of the 21st as having been materially altered by the supplement executed on the 23d; as by the former the certificates were to be delivered to Titus to be delivered to the shareholders of the Baltimore Company, while by the latter they were to be issued to Titus, to be endorsed by him, and distributed to such shareholders. The proper construction of either is substantially the same, viz: that such shares should be transferred through the medium of Titus, as receiver and distributer.

The first agreement was made with Hickok and his associates; but as the assignment was made to Hickok individually, this supplemental agreement was taken from him, for the evident purpose of securing the performance of the first. At any rate, the transfer of the leases to Hickok, in execution of the agreement of the 21st, was a sufficient consideration, if any was required, for his undertaking.

But what is more significant, the defendant does not question, in the answer, the validity of either instrument, but asserts the agreement in terms almost precisely the same as those employed in that of Hickok as assignee of the leases. The language of the answer is as follows: "And the defendant, further answering, admits that it was contemplated that the interest of the new company, proposed to be formed, should be divided into 4,000 shares of stock, and that said Hickok and others, as a part of the consideration of said assignment of said leases, agreed to and with the complainant, as president of the Baltimore Mining Company, that on the formation of said proposed new company, 800 shares of unassessable stock in the same, to be numbered from 1 to 800 inclusive, should be issued to the president of the Baltimore Mining Company, to be endorsed by him, and distributed among the shareholders of said company; and that said new company

should be organized, and stock should be issued, within sixty days after the date of said agreement." The defendant also alleges that such company, viz: the Vulcan, was accordingly organized; that the stock was divided into shares as contemplated, and that 800 unassessable shares were to be alloted and transferred to the Baltimore Company; and further that the Vulcan Company has ever been ready to perform such agreement, and, after the perpetration of the frauds complained of in this bill, actually made out certificates according to the terms of such agreement, which are now ready for delivery.

Thus it appears that the defendant does not seek to repudiate this agreement of the 23d of November, and I see no good reason, in morals or equity, why we should volunteer to do so for it, even if it differed substantially from the first.

Now, by either, or both instruments, Titus was made the intervening party between the two companies, and, as such, was authorized to demand the certificates of stock for distribution. The Vulcan Company is bound to recognize him as such, for it is bound to execute the agreement under which it acquired the title to the locations 267 and 269, and which had been fully recognized in its articles of association; and it can not question his right to demand that the certificates of stock should be issued to him, as its agreement is executed by issuing such certificates, in such form as he shall require. It is not concerned in any thing beyond this; the distribution of such stock alone concerns Titus and the members of the Baltimore Co., and the Vulcan Co. must be content to fulfil its engagements without asserting, to excuse the non-performance of its contract, the rights of another with which it has no concern, and by which it can not be affected, if such contract be executed in either form.

Titus, then, was regarded by the Vulcan Company at its organization, and is so recognized by the defendant, as

the person to whom the certificates of stock were to be issued, and it was the clear duty of such company to issue them to him. With their ultimate destination it had no concern, and the insertion in the articles of the purposes for which he would receive them, was merely declaratory of the relation of Titus to his company, and neither conferred right, nor imposed obligation upon the Vulcan Company.

The complainant is, then, the trustee of the Baltimore Company, for the purpose of receiving and transferring the certificates of stock, and for demanding them, if not delivered according to the agreement; and so the Vulcan Company evidently regarded him; and such is the substantial admission of the defendant in the answer. It is this demand which he makes by his bill.

Such being the case, Titus, as such trustee, had the right to file this bill without making the Baltimore Company, or its stockholders, parties, upon the well settled rule of pleading in equity, that if the mere object of the suit is to get into the hands of the trustee the property which is to be enjoyed by the *cestuis que trust*, the latter need not be made parties: — (See *Calvert on Parties* 8, 212, 213). In this state this rule has been repeatedly recognized. Thus, in *Sill v. Ketchum, Harr. Ch.* 423, it was held that *cestuis que trust* are not necessary parties when the only object of the suit is to reduce the property into possession; and *Cook v. Russell, Ibid.* 443, is to the same effect. In *Morey v. Forsyth, Walk. Ch.* 467, the Chancellor held that, where it is no part of the object of the bill to affect the existence of the trust, or the trust property, except to place it in the hands of the trustee, who can not, until then, execute the trust, it is not necessary to make the *cestuis que trust* parties. The same rule is recognized by Curtis J. in *Hall v. The Sullivan R. R. Co.,* cited in 21 *Law Rep.* 138, and in *Shaw v. The Norfolk R. R. Co.,* 5. *Gray* 162. In this latter case the objection

for want of parties was taken by demurrer to the bill, and was very ably discussed at the bar; many of the same arguments being urged which counsel have urged before us in the present case. But the court overruled the demurrer, holding that, in a suit by a trustee, when the different interests involved in the suit may be fairly and fully represented and tried without joining all the parties interested, a strict adherence to the general rule is not required, and that the *cestuis que trust* need not be joined with the complainant when he asserts no adverse claims to them, but on the contrary seeks, as their representative, to enforce the trusts created for their benefit, and in which they all have a common interest.

The true rule in this class of cases is, in my judgment, that it is sufficient that the court has before it the person or persons who are full representatives of the parties beneficially interested in the subject of the suit; and that in all cases, and especially in those where the objection is not taken by demurrer, but in the answer, or at the hearing, if the court can make a decree which will dispose of the rights of the parties before it, [without injuriously affecting those of others not parties, it will do so; but if not, and the objection be not taken preliminarily by demurrer, it will direct the cause to stand over that new parties may be added. I know of no other rule under which substantial justice can be done.

It is further objected that the bill is fatally defective in not making the Vulcan Mining Company a party defendant. If such were the case, I should not, for the reasons already stated, dismiss this bill, but order the cause to stand over until such company could be brought in. But I do not regard this objection as tenable. The theory of the bill is that such company is already a party; the defendant being the Vulcan Company in fact, but acting under a new name: and it would not only have been inconsistent, but absurd, in the complainant, under this theory, to have framed his

bill differently in this particular. The defendant alleges that
the Minnesota and Vulcan companies are not identical, and
this is the great question to be determined in the case;
as the complainant can only have relief upon establishing
such identity.

In my view, all necessary parties are before the court.

The remaining question is, whether, upon the case made,
the complainant is entitled to have from the defendant
the relief prayed. The solution of this question depends
upon that of two others: 1st. By whom was the one-half
of location 98 purchased from the Ontonagon Company?
and 2d. What is the Minnesota Company?

From a careful consideration of all the evidence, I en-
tertain no doubt but that the purchase was made by and
for the Vulcan Company. To my mind, the internal evi-
dence, afforded by unquestioned facts, that such is the
case, is overwhelming; while the testimony of the witnesses,
conflicting as it may appear, may and can be reconciled upon
this hypothesis, and upon no other. Now, those who asso-
ciated as the Vulcan Mining Company had full knowledge
of the terms of the purchase from the complainant, and
consequently that he, and those he represented, would have
a one-fifth interest in all the stock of said company. With
this knowledge they organized for the purpose of prosecu-
ting mining operations, not only upon the locations pur-
chased from him, but also upon any other lands which the
company might lease, locate or buy, for mining purposes.
Under this organization, the 800 shares of unassessable stock
were set apart, in the articles of association, to be trans-
ferred to the complainant; and the necessary effect in equity
of this appropriation of shares, as well as the undoubted
intention of the company, was to confer upon him, and
his *cestuis que trust*, the one-fifth interest in all its opera-
tions, upon any and all locations it might acquire. Opera-
tions were commenced upon the locations first purchased,
but no success followed, and the project of procuring one

or more other locations was agitated, as will appear from facts to which I will presently advert.

It must now be borne in mind that Knapp was the agent of the Vulcan Company in conducting its operations; and that Hickok, as treasurer, and owner and representative of the majority of the stock, was the active director and correspondent at New York.

In July, 1847, Knapp received instructions to visit and examine the Algonquin mine, with a view to its purchase. He went, and upon his return examined the Ontonagon location, and ascertained that it was the most valuable, and a desirable purchase. Finding that it could be procured at a comparatively low rate, he started for New York to report, and to recommend its purchase. When he reached Detroit, he made some inquiries respecting the probable chances and terms of its sale, and visited the complainant at Jackson, laid the matter before him, told him of his purpose and object in going to New York, and induced him to accompany him to Detroit, introduce him to Bates, and assist in negotiating with him respecting such purchase. All this being done, and having obtained the desired information, he repaired to New York, and laid the matter before the Vulcan Company. This was about the 20th of September, and the records of the proceedings of the company at a meeting on that day, as well as the testimony of Hickok, Barry, Pearsall, Smith, and Knapp himself, are relied upon by this defendant as evidence that the purchase which he subsequently made, was not authorized by the company, nor made by or for it. These records show only that he was instructed to make inquiries as to the possibility of purchasing the whole, or a part, of the Ontonagon location No. 98, and to communicate the result. But this record, I am satisfied, as every. one reading the testimony must be, does not contain a full history of [the proceedings, nor give a correct impression of what was done. At this time the Vulcan

8 MICH — Q

Company unquestionably contemplated making the purchase, if practicable, but whether of the whole, or of a part, and whether alone, or in association with the Baltimore Company, was a question of serious difficulty; as Knapp had informed the meeting that he had proposed to the complainant that each company should buy one-half; but, as the evidence shows, Hickok said that "it would be better to keep in with the complainant, as he would be of great service in effecting the purchase." This advice of Hickok was evidently acted upon, and Knapp was instructed to conduct the negociation in such manner as not to arouse the suspicions of Titus; to secure his aid, and finally purchase the one-half of the location for the Vulcan Company, refusing, when all was ripe, to allow the Baltimore any connection in it as a joint purchaser. This, from a careful examination of all the testimony, I have no doubt, was the first scheme of fraud, to be followed subsequently by another.

Now Galloway, who acted as Secretary *pro tem.* of that meeting, and ought to be presumed to have understood what was done, testifies clearly and understandingly that Knapp was authorized by the company to make the purchase, and that he did so, as the matter was understood in the office of the company, and as he himself understood it: That Knapp went up to Detroit for the purpose of purchasing the one-half of the location, and did purchase it from Bates: That after the conclusion of, the matter, some of the Vulcan Company did not want to have Titus have anything to do with it, and that it was talked about changing the matter *after it was concluded*, but that Hickok thought the best way would be to undo that bargain, and have the matter taken out in his own name — that is, have the lease assigned to him, and he would turn it over to the parties of the Vulcan — and it was so done, as he, Galloway, understood. Thence, he says, sprung the Minnesota Company.

By the parties to the Vulcan Company was evidently intended the holders of the assessable shares; and, as neither Titus nor the Baltimore Company were parties by subscription to the articles of association, and the stock agreed to be transferred to him had been withheld, neither he nor the Baltimore Company were considered to be parties in the company within Hickok's scheme. He further says, that the rights of the Vulcan Company were claimed the same as in the Minnesota; and it was agreed and understood that the parties in the Vulcan had the same rights in the Minnesota. My limits will not permit me to quote more largely from his testimony, but the irresistible conclusion to be drawn from it is, that the purchase was made by the Vulcan Company, and that, by an arrangement subsequently made among "the parties to the Vulcan," as they were styled, the assignment of the lease was taken to Hickok for the use and benefit of such parties, and for the purpose of excluding Titus and his cestuis que trust from participation in the benefits of the purchase. Galloway was not, and could not, have been mistaken in this, and he is strongly corroborated by the testimony of Knapp and others, and by the facts sur.. rounding the purchase itself.

Now there is, and can be, no doubt but that Knapp negotiated with Bates as the agent of the Vulcan Company, and, as he himself understood, with ample power to purchase. This appears from his own testimony and that of Bates, as well as of Galloway and others. He procured the assistance of Titus, giving him to understand that he was acting by authority of the Vulcan Company, and that Titus was interested, at least as the representative of the 800 shares, in promoting the purchase. Titus never doubted this; nor did Knapp, until his interests and those of the other witnesses for the defendant, demanded another construction to be placed upon the transaction. Knapp, in his testimony, says that neither himself

nor the complainant liked the shape of the instructions which were given to him about the purchase of location 98, and that he and Titus wanted the contract from Bates to run to the Vulcan and Baltimore Companies, but that he told Titus *he must abide by his instructions.* What those instructions were we have already learned from Galloway; and his testimony, and that alone, explains this of Knapp, which is inexplicable without it. It was to secure Titus' aid through his interest in the Vulcan, and yet exclude the Baltimore Company from joining in the purchase.

Knapp says, that after the price was agreed upon, a memorandum of the agreement was drawn up and signed by Bates on the part of the Ontonagon, and by himself *on the part of the Vulcan Company.* He speaks of this afterwards as the *first* contract, implying that another was subsequently made. In speaking of an interview with Conger (who, as a member of the Baltimore Company, assisted him, together with Titus, in the negotiations with Bates), in which interview it appears that Conger was desirous that the Baltimore Company should be permitted to join in the purchase, he says: "I think I told Conger that it did not correspond with my instructions *from the Vulcan Company*, and that I must abide by my instructions."

We now come to the *second*, or what the defendant claims to have been the real, contract.

After this first contract was made and forwarded to the company, Knapp went to the Sault St. Marie's with supplies for the company; and then, upon advice, as he says, returned to New York, to see that the bargain was all closed up with the Ontonagon. When he reached New York, he says, he was informed by Hickok that a general difficulty existed in the company, which had increased since he was there in September, and the members had refused to ratify the contract made with Bates. He says

he did not know what to do then, (but what the dilemma was, knowing as he did their ultimate designs, he does not inform us), but he says that he finally persuaded Hickok to purchase in his own name, and it was so done. This is precisely the consummation to be looked for if Galloway's testimony is true, and we have here the machinery laid bare by which the complainant was kept quiet, and his aid secured so long as needed, and then the pretended repudiation of the contract, that the purchase might be ostensibly made by Hickok.

Now, after this interview in New York, in which Hickok was persuaded, and, as he would have us believe, reluctantly persuaded, to make this purchase in his own name, Knapp returns to Detroit, and has an interview with Conger, and he says that "Conger very strongly objected to the way in which the papers were to be made out, and seemed very much displeased with the way they were to be executed. He said that, in the way the papers were to be executed, it just cut off the Vulcan and Baltimore Companies entirely. I told him that I was satisfied that it would all be right, and that the Vulcan Company would finally have the purchase. I told him" (and here is the key to the transaction), "that if the Baltimore Company would pay their proportion — their *pro rata* of the eight hundred shares which they had in the Vulcan Company — that such company would take the location off Mr. Hickok's hands:" in other words, as I read this testimony by the light of the well established facts in the case, the Vulcan Company purchased through Hickok, but with the intention of so holding the location as to cut off those entitled to have the eight hundred shares from participation in it, unless they would contribute towards such purchase — a condition directly repugnant to the contract and articles of association under which such shares were acquired.

Now, there was not only a meeting of the stockholders on the 20th of September, but one of the trustees on the

21st, to which I shall hereafter more fully allude. Of what transpired at this latter meeting we have no direct information, but Knapp, who was present at both, evidently knew all, and his statements to Conger have great significance in consequence. He knew both the nature and extent of his powers, conferred at either the one or the other meeting, and he also knew, and his testimony shows, that the understanding was that the Vulcan Company was and should be the actual purchaser of the one-half of 98: that it should never be the private adventure of Hickok, or of any person except their own association. The knowledge of these facts enabled him to say to Conger that he was satisfied that it would be all right, and that the Vulcan Company would finally have the purchase; for he well knew that it was made for it.

There is another important fact which characterizes this purchase. Titus not only assisted Knapp in making such purchase, but he was the drawer of one, and the endorser of the other of the drafts given in payment; thus rendering that valuable service which Hickok suggested, at the meeting of the 20th of September, he might afford, and which the company expected he would.

I can not reasonably suppose that the complainant would have done this, had not the purchase been made by the Vulcan; nor can I appreciate the reasoning which maintains that, after this aid, the company can equitably deny his right to participation in the purchase, or that of his *cestuis que trust.* All the facts attending the transaction show that he was acting for such company in assisting Knapp, and in lending his credit to effect the purchase, and that it was by the procuration of its agent that he so acted; and the company ought not to be suffered, upon any technical pretext, to deny in a court of equity the validity of the purchase thus made, nor to escape the responsibility to him, and those he represents, growing out of it.

But this is [not all. While Knapp was in New York,

although it had been assertained that operations, if continu-
ed upon the locations 267 and 269, would be useless and
fruitless, the company voted to continue mining operations
during the ensuing winter.  This is inexplicable if the com-
pany did not design to purchase location 98 from the On-
tonagon; as Knapp tells us that he informed the company
that these locations were worthless, and that further opera-
tions upon them would only result in a squandering of mo-
ney.  We know too much of the members of the company
to believe they would pursue such a course; and we accord-
ingly find that Knapp, as soon as the purchase from the
Ontonagon Company was made, removed the men and sup-
plies of the Vulcan Company from these locations on to
the new purchase, and there carried on operations in its
name until the next summer.   There is [no direct evidence
that the company knew that he had abandoned the old
and was operating upon the new location, until some time
in the spring of 1848; but no one can doubt that it was
known and contemplated that he would abandon it for
operations upon the newly acquired location, if the pur-
chase from the Ontonagon should be made; and it is evi-
dent from the proceedings of the meeting of the 6th of
December that his doings were then known.  The resolu-
tions of that meeting, that the company would cease opera-
tions for the present, and calling upon Knapp for an ac-
count, have no effect upon my mind, in the light of the
facts already adverted to, to establish either that the
Vulcan Company had not authorized his course, or that
it had been repudiated.

Cash, who acted at location 98 in behalf of the On-
tonagon Company, distinctly states that it was put into the
possession of the Vulcan Company; that notes were given
in the name of the Vulcan Company to men who had claims
against the Ontonagon Company, to induce them to abandon
opposition to the transfer, and that he had an account with
the Vulcan for supplies, .&c., furnished in the spring, and

not with the Minnesota Company, until in the summer of 1848. Knapp also, during all this time, made contracts in the name of the Vulcan Company, relating to the working of the mine upon such location, and gave notes in its name, and drafts upon it; and we have no evidence that they were ever repudiated by it. Even as late as the 18th of April, 1848, Knapp, as agent of the Vulcan Company, informed Bates that on examination the *Vulcan Mining Company* had selected the north half of location No. 98 as its choice between the two halves; and all this occurred after the pretended individual purchase by Hickok, with all the particulars of which Knapp was fully conversant. Can there remain any reasonable doubt, upon all these facts, as to what party purchased this location?

But we are referred to the testimony of certain persons who afterwards associated in forming the Minnesota Company, and in diverting this purchase from the uses originally contemplated, to show that Galloway is mistaken, and that the Vulcan Company never made such purchase.

I will hastily glance at the testimony of some of these witnesses. And first at Hickok's. I regret exceedingly that the limits of an opinion will not suffer me to place his testimony and that of Galloway in juxtaposition. In almost every particular they are variant. Hickok is positive that the Vulcan Company did not purchase from the Ontonagon; Galloway is equally positive that it did. Hickok is remarkably clear and distinct in his recollection of the proceedings of the Vulcan Company at the meeting of the 13th of October (to which I shall again allude) : Galloway, who was secretary of the meeting, knows nothing of the facts Hickok so minutely details. Galloway's testimony squares with all the ascertained facts of the case; Hickok's with none, except those which promoted the fraud he was active in perpetrating.

The first contract was made by Knapp somewhere between the 20th of September and the 1st of October. On

the 21st of September, the day after the meeting at which the defendant claims that all the authority was given to Knapp which he ever received, and the day on which the trustees of the company held a meeting, to which I shall presently allude, Hickok, in the name of Hickok & Co., wrote to Titus that Knapp had a "kind of *carte blanche*" from the company to operate as he should "deem would best serve the interests of the stockholders," and that the matter in regard to the purchase of this location had been left with him, to make, if possible, his negotiations in Detroit. He states further, that the Vulcan Company had the fullest confidence in Knapp's operations. On the 12th of October, Hickok writes an official letter as treasurer of the Vulcan Company, to Bates, in which he says "Knapp was duly authorized to make any purchase for the Vulcan Company that he deemed best for their interest, and in the purchase of one-half of the Ontonagon location, the trustees approved his course," &c. "When I forward the certificate of deposit," he says: "I will also send a special power of attorney, for you to have executed by the trustees of your company, for you to convey to the *Vulcan Mining Company* the one-half of said location." This is the letter which, he says, was so bitterly condemned by the company on the 13th, and yet the minutes of this meeting of the company (upon the silence of whose record so much reliance is placed by the defendant at other times) is totally silent upon this subject, except to state that communications were presented from Knapp, its agent, and Bates and Titus, which were directed to be entered on file, and the meeting adjourned. Certainly we could hardly draw an inference of disapproval or of repudiation from this entry.

On the 30th of October, he writes to Titus that he thinks Knapp's course (in making the purchase, without doubt) a very prudent one, and of the highest importance to *the company*, and he then makes him a proposition for

the swindling of both the Baltimore and Vulcan Companies, in which he recognizes the complainant's interest in the purchase. It is as follows, "I have the following proposition to submit to you, which can be carried out, and with the same benefit to you and to our firm. It is this It shall be represented by others that your company has abandoned its location, which you can credit. I will make the same representations here, and manage to buy up all the stock. During this time, however, your company can be at work on such part as Mr. Knapp will set aside for it, on the Ontonagon location. You and I will arrange the preliminaries with regard to a part of location purchased from the Ontonagon Company. You can then submit the proposition agreed upon, and I will put it through for you. I think this plan will be as advantageous for your company, and such a course would be more satisfactory to the members of our company, so long as they did not know the object, which of course they could not."

Now, did Hickok believe when he wrote this letter, that the members of the Vulcan Company, at the meeting on the 13th, had so severely censured his letter to Bates of the 12th, and had then repudiated the purchase? or what did he mean when he tells Titus he can submit the proposition agreed upon, and he will put it through for him? If the Vulcan Company had repudiated Knapp's acts in the purchase, and it was to be made by him in his own right, as the defendant would have us believe, I am at a loss to know to whom Titus' proposition could be made, or with whom Hickok would put it through, except himself; or who was to be satisfied except himself. To my mind this letter establishes the fact, that his purchase was in behalf of the company, and excludes his testimony from any claim to consideration, as contradictory to that of Galloway.

Mr. Barry does not regard the proceedings of the meeting of the 20th of September as having conferred any au-

thority upon Knapp to purchase for the company; but quite the contrary; and he regards the purchase as having been made by Hickok on his own account.  That he is truthful I do not doubt, and so is Galloway; but he evidently mistakes the discussion of the members for the action of the company.  But Barry was absent from the meeting of the 13th of October, and this fact renders his testimony of comparatively little value, when weighed against that of Galloway and Knapp, as well as against every fact attending the purchase, and the course pursued by Knapp at the time, and long subsequent to the purchase.

So far as he, Pearsall and Smith, are concerned, they are clearly mistaken, both when they say that Knapp was not authorized to purchase, and that Hickok purchased on his individual account.  I have, I trust, already sufficiently shown that they must be mistaken as to Knapp's authority; and as to the purchase by Hickok, of which they speak in equally positive terms, they are contradicted by his and their own deliberate admissions, as well as by the whole internal evidence of the case.  Now, Hickok in his assignment of the lease of 98 to the defendant, among whose members were Barry, Pearsall, Smith and Knapp, expressly admits that he did not purchase for himself—his language being, "and whereas the undersigned made and held such purchase as trustee for himself and the persons who have formed an association," &c.— and these witnesses, in the articles of association of the Minnesota Mining Company, over their own signatures, admit as follows: "The undersigned, parties to this instrument, having purchased *through* Wm. Hickok," &c., the property in question.  Of whatever little value this evidence may be for other purposes, it shows the understanding of the defendant's witnesses of the character of Hickok's purchase, and fortifies, to the fullest extent, Galloway's testimony.  There is evidently something of the meeting of the 20th of September suppressed, or what is perhaps more probable, forgotten by them.  But however this

may be, there was another meeting, to which I have already alluded, the proceedings of which are not given to us, except by the general minutes of the company, kept as in other instances — (Titus could not, and the defendants have not given them) — which might explain and clear up the whole matter. The trustees were authorized by the articles of association to make this purchase. They had a' meeting on the 21st of September, at which Knapp was present, and it is not impossible that the instructions and authority to him, of which he speaks to Titus, Conger and Bates, were then fully given to him. That he had such, and acted upon them, can not be questioned ; and Hickok's letter to Titus respecting Knapp's authority, in which he says he has *carte blanche,* &c., to which I have already alluded, was written upon that day, and evidently after some meeting at which authority of some kind had been conferred upon Knapp. Galloway may have confounded, in his recollection, the proceedings of the two meetings ; and this fact may enable us to reconcile much of the apparent conflict of testimony.

Be this as it may, I have no doubt, from all the evidence, that the purchase of the one - half of location No. 98 was made by the Vulcan Company, and that everything done thereafter, and until the organization of the Minnesota Company, was for the purpose of keeping the complainant and the other shareholders of the Baltimore Company, entitled to have the one - fifth interest, from sharing in its benefits. Had the speculation turned out worthless, I have no idea we should ever have heard of this defense.

Although the Minnesota Company may now comprise many members who were never in the original company, yet it is, in fact, so far as this location and this complainant are concerned, the Vulcan Company; and it would be a disgrace to equity if it could not tear off so flimsy a covering for fraud as overspreads this transaction, or that substance and facts should be sacrificed by it to a name.

The defendant, to avoid the consequences of this construction of the purchase, insists upon various strange, and in my judgment, inequitable defenses. Among others, that the Vulcan Company is still alive, having an independent existence, and ready to perform its contract with the complainant. This may be; but except as it lives in the Minnesota, no galvanic power can endow it with motion.

It is also insisted that, under its articles of association, the Vulcan Company had no right to make the purchase. If the Minnesota Company is not the Vulcan, it has no interest in litigating this question; nor can the existence or non-existence of such right affect it. But if it be the same, a defense which is fraudulent in its very character, one by which a portion of the association, asserting and insisting upon the validity of the purchase as to themselves, deny its validity for the purpose of defeating the asserted claims of others to participation in it, should be spurned from a court of equity.

It is further insisted that, by the conditions of the purchase from the Baltimore Company, the association to be formed, and in which the complainant was to have the interest of 800 shares, was to be formed upon the basis of the locations so purchased; and that if the Vulcan Company extended its operations beyond, the Baltimore might be excluded therefrom, as no consideration moved from the latter except so far as operations upon the locations sold by it are involved. As already remarked, this defendant, unless it be the Vulcan in fact, has no interest in, nor can it litigate, this question. If otherwise, the answer is, that it can not be permitted to repudiate its own deliberate engagements. The locations purchased from the Baltimore Company were the basis, it is true, of its organization; but by no means the limits of its operations. When the Vulcan Company framed its articles of association, it was with this understanding, and with a full knowledge and understanding of its obligation under the con-

tract with Titus. This was to assign to him the one-fifth interest in its stock, as a 'part of the consideration for the purchase of locations No. 267 and 269. This stock would confer upon its holders rights co-extensive with the operations of the company. The company was obligated to embrace such locations within the field of its operations, but was by no means to be restricted to them. By the articles of association, provision was made for extending them if found desirable; and I apprehend if such had been done by the unquestioned purchase, by the company directly, of this location 98, and the works had been extended over it, and no Minnesota Company had been formed, no one would claim that the eight hundred shares of stock, if they had been transferred, would not have entitled Titus and those he represents to a full participation in all the benefits of such purchase, and this upon the ground that, under the contract, and the articles, they would be unqualifiedly entitled to it. It is the fraud of the defendant that obscures this question. The contract with Titus was, not that he should have 800 shares of stock which would entitle the holders to such proportionate rights and benefits as might result from mining upon these locations; but it was that he should have those shares of the stock of the company, unqualified by any limitations, whether its operations should be circumscribed by the limits of these locations, or expanded over others which might be procured. In relation to this interest, Titus and the Baltimore Company do not stand as purchasers, seeking to enforce the specific performance of a contract, but as vendors from whom the whole consideration has passed. No consideration moved from Titus as a purchaser of the stock, as that was a part of the compensation to be paid for the locations he sold; and this one-fifth interest in all the operations of the company, was as essential a portion of such consideration as was the $4,500 of cash. It was, I admit, as to this, an adventure,

in which all embarked with full understanding of the risks and perils to be encountered; but I can not understand by what course of reasoning equity can allow the success of such adventure to justify the repudiation of the obligation which was created as a part of the adventure itself.

But, if the fact were otherwise, and the consideration moved from the complainant, yet upon every equitable principle, if the purchase was made by the Vulcan Company, he is entitled to his stock, and the full benefits it will, by the articles and the company's operations, confer.  I confess that I can not understand the reasoning, even upon this assumption, by which the proposition is sought to be maintained, that one who enters into an association or co - partnership upon an originally equal footing with its other members (as every holder of those 800 shares would), must pay additional consideration if he would participate in its expanded operations, and such as are within the scope of the original articles under which he so enters.  But the defendant in the answer does not set up any such defense, but denying its identity with the Vulcan, is yet willing to deliver the stock.  I know no good reason why it should not be taken at its word.

It is also claimed that the members of the Vulcan Company had a perfect right to form an independant association, for the purpose of conducting mining operations upon such land as they might acquire, or to unite with other associations.  It is unnecessary, nor am I disposed, to deny this proposition.  But a portion of them have no right to take a portion of the common property, and appropriate it to their own use, in derogation of the rights of others.  The Vulcan Company need not have included in its articles a provision for extending its operations to other locations than those purchased from the complainant, or it might have stricken out such provision; but so long as it remained, it was binding; and the purchases made under it enured to the

common benefit of all its stockholders, and of those to whom it had contracted to convey stock; and could not be diverted by a part. If the Vulcan Company had not bought this one-half of location 98, no question of the right of this defendant, or of its members, could arise; but when, as I think is clearly proven, it was purchased by the company, none of its members less than the whole, no matter what name or new organization they may assume, can appropriate it to individual purposes, or deprive their associates of participation in the benefits growing out of it. It is further claimed that, although had the company made this purchase with its own funds the complainant would have an equitable as well as legal right to participation in it, yet as it was paid for by Hickok, no such equity or right exists in him. If such purchase was made by and for the Vulcan Company, the fact that Hickok advanced the payment for such company, can have no effect to deprive a portion of the members of the company of their rights in common with all, nor to enable such company to deprive one already entitled to stock, of such stock. If the advance was made by Hickok for the company, it was still a payment by the company, so far as the rights of the members, as between themselves, and those of Titus, as against it, are concerned; and, although Hickok may have a claim against the company for such advance, yet one portion of its members can not exclude another portion, whether stockholders in fact or by contract, from a participation in the purchase upon that ground. Titus himself drew and endorsed the paper which was given to Bates upon the purchase. Had he, instead of Hickok, taken it up, and he and his friends appropriated the property, as Hickok and his friends have in the present case, I apprehend that quite another view would be taken of this question by those who would then be the defrauded members of the company. But it may be said, Hickok also had the title; but the answer is in his own words, he "made and held such purchase

as trustee," and he could assert no such rights as against his *cestuis que trust*, whom I find to be the Vulcan Company. I can conceive of no rights which a portion of the company can assert against others, growing out of the fact of the advance of the payment by Hickok; and no equities existing in favor of one portion who have not paid, against another portion in the same dilemma.

I think the decree of the court below should be reversed, and a decree rendered for the complainant.

CHRISTIANCY J.:

I express no decided opinion in this case as to the sufficiency of the bill on the question of parties complainant, though I am inclined to think it defective in this respect, and have no doubt it is so as to parties defendant.

But I shall not go into the question of parties at all; since, if all proper parties were before the court, yet, upon the merits, as exhibited by the pleadings and proofs, I am wholly unable to discover any equity on the part of complainant or his associates, the Baltimore Company, which can authorize him or them to call for relief in a court of chancery. Upon the merits, therefore, I concur in the result with my brother Manning, and generally in the views he has expressed upon the evidence, and the reasoning he has adopted, so far as it extends. I shall therefore confine myself to a few plain principles, which I think exercise a controlling influence upon the case, and shall avoid all matters of detail.

The bill is in the nature of a bill for the specific performance of a contract; it is an appeal to the sound discretion of the court, and to be sustained, if at all, upon the broad principles of equity. It is not a case in which the court is compelled, by the force of an iron rule, contrary to its sense of justice, to aid in enforcing a wrong, under the name and guise of a judicial proceeding. And

8 MICH.—R

whatever may be the technical legal rights of the complainant, if his claim should be found unconscionable — if the facts of the case are not such as to create any moral obligation on the part of the defendant, and the relief asked would violate rather than secure the just rights and real equities of the parties — relief should be denied.

If the complainant (and I use his name as including and representing the Baltimore Company) has any equitable right to the eight hundred shares of stock, claimed from the Minnesota Company, that right must be based upon some consideration. The only consideration, upon which all his equities rest, was the transfer to Hickok and his associates (afterwards constituting the Vulcan Company) of the Baltimore leases or locations, No. 267 and 269; and the claim rests exclusively upon the agreement with Titus (or the Baltimore Company) for the formation of a mining company, "*on the basis of these locations,*" and for the issue to the Baltimore Company of the unassessable stock in the company so to be formed.

The consideration which the complainant's company received, for the transfer of these locations, was four thousand five hundred dollars in cash, and the agreement for the eight hundred shares of stock to be based upon these locations. And the only consideration which Hickok and his associates received, for the four thousand five hundred dollars paid by them, and for their stipulation to issue the stock, was the transfer of these locations to them. The eight hundred shares of stock were to be unassessable; and of course complainant's company were not to be called on to contribute to the expense of mining operations by the company to be formed; but the whole of that expense was to be borne by the other four-fifths of the stock. This was upon the ground that the excess in the value of these locations, beyond the four thousand five hundred dollars, was considered an equivalent for the amount to be contributed by eight hundred shares of stock,

in the prosecution of mining operations by the company, for the whole time the company should continue in business. This was the amount put at risk by complainant and his associates in the common enterprise; and the four thousand five hundred dollars paid by Hickok and his associates, together with all the expenditures to be made in the prosecution of the contemplated mining operations, was the amount to be put, at risk by the latter in the same enterprise. These risks were connected with and undertaken on the faith of these locations alone, and all parties looked to the profits to be made from mining upon *these locations* only, for reimbursement. None of the parties, by this agreement, contemplated the formation of a company for mining in any other place, nor that the stock to be issued to complainant and his associates was to rest upon any other basis. To this extent, and to this only, Titus and associates had paid a consideration or equivalent for the exemption from assessment on the eight hundred shares of stock they were to receive; and the obligation entered into by Hickok and his associates, was exactly co-extensive with this consideration. There was no consideration, nor any stipulation for stock, which was to rest upon the basis of mining elsewhere, or which contemplated the purchase of other locations.

But Hickok and his associates, the Vulcan Company, in framing their articles of association, went beyond the obligations of their contract with complainant; and, after declaring the purposes of the company to be the prosecution of mining operations upon these locations, add the words, "or any other lands in said mineral district that may be leased, located or bought by the association for mining purposes," — thus providing for the case of a purchase of other locations not contemplated by the agreement with complainant.

Neither Titus nor any of his associates signed these articles, though he individually, by the original agreement,

had agreed to take one hundred shares in the company to be formed.

Now, so far as these articles went beyond the original contract, and provided for the purchase of, or for mining upon, "any other lands," &c., they were without consideration, purely voluntary, and created no obligation on the part of Hickok and his associates, the Vulcan Company, to Titus and associates. The latter were no parties to this additional provision, were not bound by it, and could not claim to bind the Vulcan Company by it.

The Vulcan Company were at liberty the next day, or the next year, to strike out this provision from the articles, and Titus and his associates could have no right to complain.

If the Vulcan Company should attempt to divert any of the company funds to the purchase of a new location, the Baltimore Company might, by reason of their interest in that common fund, restrain them from so doing, and confine their operations to the scope of their contract. But, if the Vulcan Company had already so appropriated the common fund, the Baltimore Company might probably either call for an account and repayment of the fund so misapplied, or elect to ratify the act, and take their shares in the new adventure in which it was invested.

But I think it entirely clear, upon the evidence, that no part of the company funds was ever diverted to the purposes supposed; and, as I shall more particularly notice hereafter, at the time when the Ontonagon location was purchased, the Vulcan Company had no common fund in which the Baltimore Company could have any interest whatever.

There was nothing in the nature of the contract with complainant, nor in the relations created by the articles of association, to prevent the individual stockholders from becoming stockholders in any other joint stock company for mining purposes. These stockholders, or any of them, had

a perfect right, at any time they saw fit, to form a new company, and to take shares in it exactly in proportion to their shares in the Vulcan Company, or in any other proportions. In forming such company, they had a right to choose their own associates; and any such stockholders in the Vulcan Company who might choose to form a new company, and to purchase a new location, were under no obligation to inform their other associates of their intention, nor to give them the chance to share in the new adventure. In this respect, I think the law is not so stringent as applied to stock companies as it is to partnerships under ordinary articles of co-partnership. Stock passes, and is intended to pass, from hand to hand in the market; and there is a change in the membership as often as the stock changes hands. There is no implied obligation or duty to refrain from entering into any other adventure of a similar character, with other associates. At all events, even upon the score of strict partnership, the stockholders of the Vulcan Company who might see fit to purchase a new location with their own individual means, and without using any common fund in which the Baltimore Company had an interest, could be under no obligation to admit the Baltimore Company on any *better terms* than those on which they had been admitted to participate in the stock of the Vulcan Company to be based upon the Baltimore locations. For their unassessable stock, based upon *these locations*, they had contributed what was deemed and agreed upon at the time, to be their just proportion or equivalent; and if they sought to participate in this new location, and to hold stock based upon it, it should be upon the terms of paying their proportion to this also. But neither the bill nor the evidence makes any such case; nor is the claim of the complainant and his associates based upon any such ground. They do not ask, nor, so far as it appears, were they ever willing to participate in the purchase on such terms, or to put

a dollar at risk on the faith of it.     But they seek to participate in the chances of profit, without the hazard of loss, and without paying or offering to pay a dollar.

The process of reasoning by which this claim is sought to be supported, when analyzed and reduced to plain English, is this: "Titus and his associates were allowed to participate in the Vulcan Company, and to hold unassessable shares in its stock based upon the Baltimore locations, because they had paid for this privilege by the conveyance of these locations to the company; therefore they have the right to participate in the profits of the Ontonagon location, bought with the money of others, and to hold unassessable stock based upon it, without the payment of any consideration or equivalent whatever." And this claim, standing upon this basis, is gravely termed an equity; and the refusal of those who have paid their own money for the Ontonagon location, to recognize this claim, and their various excuses, pretences and efforts to avoid its recognition, have been as gravely denominated a fraud. But, before these refusals, these excuses, and pretences, however false, can entitle the complainant to any relief on the ground of fraud, it must appear that the acts complained of as a fraud affected, or were calculated to affect, injuriously, some *right* of the complainant or his associates. If the stockholders of the Vulcan Company had a right to do directly, openly, and in defiance of the Baltimore Company, what it is claimed they have done indirectly, then the false pretences and subterfuges to which it is claimed they have resorted to conceal their design until accomplished, and to avoid the hostility of the Baltimore Company — though a moral wrong — would constitute no wrong of which the Baltimore Company have a right to complain, nor give that company any equities they did not before possess.     Thus — for illustration — if I promise to make you a gift of a horse, this promise creates no obligation which law or equity will enforce; and I am at

liberty to refuse without giving any reason or excuse whatever. But, if I choose to give a false reason, or to resort to falsehood to induce you to believe I still intend to give you the horse, when I do not, will this convert my void promise into a valid contract, and give you any greater right to enforce your claim, based upon no consideration, when you had lost nothing by the falsehood, and had no right which could be affected by it?

The equities of Titus and his associates were co-extensive with their contract, with the consideration they had paid, and were confined to stock in a company formed for mining upon the particular locations they had conveyed to Hickok and associates. The value of the stock they were to receive under the contract would depend entirely upon the value of these locations for mining purposes — for it is not pretended that the leases on which they were held were of any value whatever for any other purpose. At the time the contract was entered into, these locations or leases upon which the contract and the interests of all parties under the contract were based, were considered of great value. If they should prove so in fact, both parties to the contract would participate in the benefit; if they should prove to be worthless, both would lose the amount they had expended or put at hazard.

What then was the value of these locations, when the purchase of the Ontonagon location was made? The whole evidence in the case shows that it had been ascertained to be nothing, and worse than nothing; a mere source of expenditure without a hope of return. This is so clear that is is not controverted; and the complainant's claim is based in some measure upon this very fact. Under such circumstances, were the Vulcan Company under any obligation to continue mining operations upon it, and to waste money to no purpose? Clearly not, and it is equally clear they were under no obligation to purchase another location; and if they chose to cease all further operations, no court of equity

would compel them to proceed. Had they even chosen to disband and allow the company to· be dissolved, the Baltimore Company would have had no right to complain. The value of the Baltimore Company's interest, then, under their contract, and the value of the consideration they had given, had been ascertained to be nothing. Possibly, if the Vulcan Company had actually dissolved, the Baltimore Company might have been entitled to their proportionate share of the surplus of assets after the payment of all debts. But the evidence clearly shows there was no such surplus; that the assets were not sufficient to pay the debts,· but that these were paid by an assessment upon the stockholders.

The whole and the only enterprise contemplated or embraced by the agreement with complainant and his associates, that agreement itself, the consideration for it, the obligations growing out of it, and the equities founded upon it, must, I think, in a court of equity, be looked upon as having failed, and become extinct, and all the equitable obligations of the Vulcan Company to the complainant and · his associates, as fully satisfied. The adventure had terminated, and all parties had lost what they had put at hazard.

· Under these circumstances, if a new location was to be purchased by the Vulcan Company, and mining operations to be prosecuted upon it, it would be an entirely new adventure, one not contemplated by the agreement with the Baltimore Company, and to which they had contributed nothing; and there being no funds or assets of the Vulcan Company with which to make the purchase or prosecute the work, the fund for that purpose must come from the contributions of the individual stockholders; and upon principles of equity and fair dealing, the Baltimore Campany, if they would participate in the advantages of the enterprise, should contribute their *pro rata* to the expense; for as yet they had contributed nothing to it, nor even contracted for any participation in it.

Admitting, then, that, under these circumstances, the

Vulcan Company had, without any contribution from the Baltimore Company, purchased the Ontonagon location with funds contributed by all the assessable stockholders in proportion to their stock, and the conveyance had been taken directly to the company — which is more than the evidence shows or is claimed to show — whatever might be the strict legal rights of the Baltimore Company, or whatever claim they might have if the stock had already been issued to them — when they come into a court of equity, and ask a decree for the issue of stock which is to entitle them to participate in the profits of the new location, they must submit to the rule that he who asks equity must do equity: and this would require them to aver and prove a readiness and willingness to contribute their share of the burden. Had the Baltimore Company actually obtained the stock before the new purchase was made, they might, perhaps, as matter of strict technical law, be entitled to the advantage thus gratuitously and improvidently bestowed, though it would be grossly unjust and unconscionable to insist upon it. But when compelled to seek the aid of a court of equity to obtain the stock, that court should refuse to aid in the enforcement of so unconscionable a claim, and leave the parties to such remedy as they might be able to obtain upon their contract in a court of law.

Had it been distinctly admitted by the defendant that the purchase was made by Hickok upon a full understanding and agreement with all those who subsequently formed the Minnesota Company, that he should purchase it in trust for the company so to be formed, each individually paying him their respective shares — and this is all it is claimed the evidence *tends* to show, and much more than I think it does show — still I am entirely unable to discover any ground, under the circumstances of this case, upon which the Baltimore Company could object, or claim a benefit from the purchase. But it seems to be supposed that because Titus aided Hickok by his friendly offices

(for he paid nothing) in the purchase of the Ontonagon location, with the belief that it would ultimately be taken by the Vulcan Company,' these services are to be considered as a good consideration for an obligation on the part of the Minnesota Company, who took the location off the hands of Hickok, to give to complainant's company the eight hundred shares of stock. And this is certainly the only consideration shown for complainant's claim. Let us see whether this reasoning is sound.

That Titus and his company would have been greatly benefited by having the Vulcan Company make the purchase in such a manner as to let in this claim for unassessable stock, may be readily believed; as it would be so much clear gain to the complainant's company, without expense or risk. And that Hickok and Knapp were also anxious for such an arrangement is clearly shown by the evidence: they also held stock in the same Baltimore Company, Hickok being a large stockholder. The interests of Hickok, Knapp, and complainant were identical, and they acted in concert. If they could induce the Vulcan stockholders into such an arrangement, it would make the Baltimore stockholders permanent pensioners upon the Vulcan Company, and enable them "to reap where they had not sown." But all the Vulcan stockholders did not own stock in the Baltimore Company, (though a few others owned nominal amounts). To those not thus interested, or but nominally interested, such an arrangement would be grossly unjust. Still, if they chose to enter into it voluntarily, with their eyes open, all very well. But such an exhibition of disinterested benevolence was hardly to be expected in the stock market; and, it may be added, hardly to be demanded as a *right* elsewhere. The most conscientious men might be expected to object to such an arrangement as unequal, requiring them constantly to pay without receiving, while the other parties were to receive without paying.

Still Titus, Hickok and Knapp, had a right to make the

effort, and to use all fair means of persuasion to induce the recognition of even such a claim. But the Vulcan stockholders had, at least, an equal right to refuse.

The attempt was made. Titus, Hickok and Knapp labored zealously and in concert to effect their joint object; but, as ought to have been anticipated, the Vulcan stockholders, the moment they saw the object, took the alarm, and protested. Hickok, however, still believing his influence with the Company would enable him to obtain their consent, still persists, and undertakes to accept the proposition of Bates, for the sale of the Ontonagon location, in the name of the Company, without authority of the Company to do so. They repudiate his acts. He then, having confidence in the location, makes the purchase with his own money, and takes the conveyance in his own name, evidently still in the hope, in which Titus and Knapp also share, that the company will eventually take it off his hands in such manner as to subject it to the claims of the Baltimore Company. But the Vulcan stockholders still obstinately refuse, as any man capable of managing his own affairs would be likely to refuse, to go into an adventure upon such a basis: most of them, however, did ultimately consent to take an interest in this purchase, and, with Hickok, to form a new company on the basis of it, as I think they had a perfect right to do.

Whatever efforts Titus may have made in this matter, were made for his own interest, and that of his company; not for the stockholders of the Vulcan Company, who subsequently formed the Minnesota Company. He had spent some time, and labored faithfully, in the attempt to induce the Vulcan Company to purchase the Ontonagon location, and to bestow one-fifth of it gratuitously upon the Baltimore Company. Having failed in this attempt, shall the court now decree him that same fifth as a compensation for his time and services in soliciting the gift? If Titus could have any claim for such services, it would be against those for whom he performed them, and for what his services were worth.

If he had been about to purchase this Ontonagon location for the Baltimore Company, and had been induced to forego the purchase by the representation of the Vulcan Company or its agents, that the purchase was intended for the Vulcan Company, so as to let in the claim of the Baltimore Company for stock, the case might have presented a different aspect. But nothing of this kind is pretended.

The merits of this case, were, I think, fully met and ably presented by the Judge who tried this cause in the court below, and his decree dismissing the bill must be affirmed.

CAMPBELL J., did not sit, having been counsel for one of the parties.